Merrimack
No. 83-194

## THE STATE OF NEW HAMPSHIRE

### v.

## ARTHUR R. RILEY, JR.

March 20, 1985

258

*Gregory H. Smith*, attorney general (*Amy L. Ignatius*, attorney, on the brief and orally), for the State.

*Joanne S. Green*, assistant appellate defender, of Concord, by brief and orally, for the defendant.

DOUGLAS, J. The defendant, Arthur R. Riley, Jr., was convicted in Superior Court (*Souter*, J.) on a charge of negligent homicide, RSA 630:3, II. On appeal, the defendant raises two issues for review: first, whether the results of his blood alcohol content test should have been excluded as the product of an unlawful arrest; and second, whether the process of drawing the blood for a blood analysis may be conclusively presumed valid under RSA 265:90 (1982) (since amended), where neither the defendant nor the State requests the production of the technician who drew the blood. We affirm.

On the evening of September 13, 1982, the defendant was driving a U-Haul truck when it struck a tree in Hooksett. The passengers at the time included two adults and four children. At the moment of impact, part of the shell cover was torn from the back of the truck and one of the children was thrown onto the road, where she sustained fatal injuries. The other passengers were injured as well.

Hooksett Police Officer Massey was the first police officer to arrive at the scene, and after he observed the deceased and two passengers in the truck, Officer Stout arrived. Officer Massey instructed Officer Stout to locate the driver of the truck and determine the number of people involved in the accident. At that time, the police had received conflicting estimates of the number of people involved in the accident, ranging from five to nine, and were concerned that one of the passengers might have been thrown into a nearby pond.

While Officer Massey was examining the damage, he found two or three six-packs of beer and a bottle of pre-mixed cocktail preparation in the cab of the truck. At the same time, Officer Stout recorded the names of the passengers still in the truck and spoke with Ms. Bourgoin, one of the passengers. At the hearing on the motion to suppress, Officer Stout testified that it was at this time that he was able to establish the number of people involved in the accident as seven.

After Officer Stout returned to the cruiser, a woman who lived adjacent to the accident scene approached him and informed him

that the driver of the truck had made a telephone call from her house. She indicated that the driver was on her front lawn and asked the officer if he wanted to talk with him. Officer Stout approached the defendant, who was kneeling on the lawn in an hysterical condition.

Officer Stout asked the defendant to accompany him to the cruiser, to which the defendant responded, "I didn't do it on purpose," and "she's dead, isn't she?" As he brought the defendant to the cruiser, the officer said nothing further to the defendant, who continued to cry and to repeat similar statements. The evidence at the hearing on the motion to suppress was conflicting as to whether the defendant was immediately placed inside the cruiser or instead spoke with the officer outside it. Neither party, however, disputes that it was while questioning the defendant, at the cruiser, as to the number of people involved in the accident, that Officer Stout smelled a strong odor of alcohol on the defendant's breath and noticed his slurred speech. Stout asked the defendant to remain in the vehicle and went to inform Officer Massey that he had found the driver.

Officer Massey went to the cruiser, where he also noticed a strong smell of alcohol coming from the defendant. Officer Massey then placed the defendant under arrest for driving while intoxicated. The officer advised the defendant of his rights and obligations under the implied consent law and asked him to submit to a blood alcohol content test. The defendant agreed to a blood test and was taken by the police to a hospital for the test. The defendant moved before trial to suppress the evidence of the blood alcohol analysis, as the fruit of an unlawful arrest.

At the hearing on the motion to suppress, the defendant argued that he was under arrest from the moment he entered the police cruiser. He argued that the arrest preceded the existence of probable cause and, therefore, that the blood test results were inadmissible.

In determining whether the defendant was arrested without probable cause, the trial court made the following findings. First, the court concluded that Officer Stout's request to the defendant to accompany him to the cruiser did not indicate a decision to arrest. The court found that the officer had not yet formed an opinion that the defendant was under the influence of intoxicating liquor. The court determined that the officer's sole purpose in asking the defendant to go to the cruiser was to find out whether all of the victims of the accident had been accounted for and were being treated.

The trial court then determined that at the time Officer Stout asked the defendant to remain at the cruiser, he had probable cause to arrest the defendant for driving while under the influence of intoxicating liquor. The court found that probable cause was based upon the defendant's statements indicating that he was the driver of the vehicle and upon the evidence establishing that the defendant had been drinking. As a result, the court admitted the results of the blood test into evidence.

On appeal, the defendant argues that he was under arrest from the moment he was requested to accompany the officer to the police cruiser for questioning and that, because the police lacked probable cause to arrest him at that time, the blood test results obtained pursuant to that arrest should have been excluded at trial.

Before we can determine whether the defendant was arrested without probable cause, it is necessary to pinpoint the *moment* of the arrest. This determination inherently requires a decision as to the level of interference with a person's right to be left alone which this society is willing to tolerate, before judicial scrutiny is applied to determine the reasonableness of the basis for the interference.

RSA 594:1, I (Supp. 1983) defines an arrest as "the taking of a person into custody in order that he may be forthcoming to answer for the commission of a crime." In *State v. Murray*, 106 N.H. 71, 73, 205 A.2d 29, 30 (1964), we determined that an arrest "is effected by an actual or constructive seizure or detention of the person arrested or by his voluntary submission to custody, both of which subject him to the actual control or will of the person making the arrest." Relying on language from the Wisconsin case of *Huebner v. State*, 33 Wis. 2d 505, 516, 147 N.W.2d 646, 651–52 (1967), this court later went even further to require "that to constitute an arrest there must exist an *intent* on the part of the arresting officer to take the person into custody and a corresponding *understanding* by the person arrested that he is in custody." *State v. Hutton*, 108 N.H. 279, 285, 235 A.2d 117, 121 (1967) (emphasis added).

The subjective requirements outlined in *Hutton* have become embedded in this court's analysis as to when an arrest occurs. *State v. Preston*, 124 N.H. 118, 120, 467 A.2d 243, 245 (1983); *State v. Hamel*, 123 N.H. 670, 675, 466 A.2d 555, 558 (1983); *State v. Lemire*, 121 N.H. 1, 4, 424 A.2d 1135, 1137 (1981). In fact, the New Hampshire Police Academy, following our cases, cites these requirements as two of the four essential elements of an arrest. ACCIDENT INVESTIGATION SCHOOL, NEW HAMPSHIRE POLICE STANDARDS AND TRAINING COUNCIL, THE TECHNIQUES OF ARREST I A, at 111-1-1.

These two requirements, however, may make the analysis unworkable. If the subjective beliefs of the participants in the arrest are

determinative of a finding of arrest, the determination turns on the mindset and, ultimately, the credibility of each. It is not difficult to imagine a situation in which a law enforcement officer did not intend to arrest an individual, yet the individual believed that he was under arrest. Hence, under a purely subjective analysis, a court would have to conclude that an arrest had not occurred, despite the unreasonableness of either of the participants' beliefs. Furthermore, as more fully discussed below, the utilization of such a standard in determining whether and when an arrest has occurred raises a potential for serious challenge under the fourth and fourteenth amendments to the United States Constitution.

 We begin our analysis by noting that while a State under our federal system may provide more protection to its citizens than the United States Constitution requires, *State v. Ball*, 124 N.H. 226, 231–32, 471 A.2d 347, 350 (1983), it may not provide less. To determine whether the prohibition of the fourth amendment of the United States Constitution against unreasonable seizures has been violated in an encounter between citizens and law enforcement officers, a court must first decide whether there has been a *seizure* of the citizen. A formal arrest is irrelevant to the analysis. An individual is "seized" for fourth amendment purposes "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.); *Florida v. Royer*, 460 U.S. 491, 502 (1983). Inextricably contained in this analysis is a determination whether there has been a "show of authority" such that the liberty of the individual has been restrained. *Id.*

In *Mendenhall*, Justice Stewart suggested that circumstances indicating a "show of authority" might include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, *supra* at 554 (opinion of Stewart, J.). These factors are viewed by an objective standard, not the asserted subjective beliefs of the particular participants in the encounter.

The requirements outlined in *Hutton* add elements to arrest neither properly required by this objective standard nor required by RSA 594:1 or the earlier case of *State v. Murray*, 106 N.H. 71, 205 A.2d 29 (1964). *See United States v. Beck*, 598 F.2d 497, 500 (9th Cir. 1979). It is quite conceivable that a set of circumstances may constitute a seizure which is improper under the fourth amendment, thus invoking its protections, but may *not* amount to an arrest under our

previous decisions because the police officer maintains that he did not *intend* to arrest the individual, notwithstanding a reasonable belief on the part of the citizen that he was not free to leave. Hence, the test to determine when an arrest has occurred under our previous decisions can provide less protection than is minimally required under the United States Constitution.

■■ Therefore, we retract the two-part subjective test propounded in *Hutton* and adopt the objective test which was laid down by the United States Supreme Court in *United States v. Mendenhall*. Although still possibly relevant to the issue of *when* an arrest occurs, any subjective beliefs of the arresting officer and the arrestee will no longer be determinative of that issue. *See Gomez v. Turner*, 672 F.2d 134, 143 (D.C. Cir. 1982).

■ Turning to the facts of the case before us, we note that not all police-citizen encounters involve the protections of the fourth amendment. Many encounters do not rise to the level of a "seizure" within the meaning of the fourth amendment because they are purely voluntary in nature, *United States v. Mendenhall*, 446 U.S. 544 (1980), or are very brief, *Terry v. Ohio*, 392 U.S. 1 (1968). As the United States Supreme Court has noted, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen . . . ." *Florida v. Royer*, 460 U.S. 491, 497 (1983).

■ We conclude that, in the light of the foregoing analysis, this defendant was not "seized" either when he was approached by Officer Stout and asked to come to the police cruiser for questioning, or when he was questioned at the cruiser. In so holding, we recognize the need for police accident investigation as a tool in the effective enforcement of our laws and preservation of the safety of our highways. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973).

The defendant was approached by Officer Stout during the course of a routine accident investigation. From the neighbor's identification and the defendant's inculpatory statements and actions, the police could reasonably conclude that he was the driver of the truck. As the driver, and one of the only two conscious adults apparently involved in the accident, the defendant was in a position to aid the police in verifying the number of passengers in the truck.

The brief exchange that occurred between Officer Stout and the defendant at the cruiser also did not transform the situation into a seizure or an arrest. Nothing in the record suggests that the defend-

ant had any objective reason to believe that he was not free to leave and end the conversation. There was no show of force; the defendant was not ordered to go to the car, but rather was simply asked if he would accompany the officer. There was no pretext or cover here for a criminal investigation.

██ ██ The defendant *was* seized, however, when told by Officer Massey to remain in the cruiser. A reasonable person would conclude that at that time the defendant was not free to leave. The combination of facts known by the officer, however, provided the requisite probable cause to believe that a death resulting from drunk driving had occurred. The officers had observed the alcoholic beverage containers in the cab of the vehicle and had also noticed both a strong smell of alcohol on the defendant and the defendant's slurred speech. The arrest thus was justified and the blood test constitutionally permitted.

We now turn to the defendant's claim that the trial court improperly instructed the jury that, under RSA 265:90 (1982) (since amended by Laws 1983, 373:19 in a manner not pertinent to this case), the process of drawing blood for a blood alcohol content test is conclusively presumed valid. The defendant advances two arguments in support of his claim. He argues first that, because the official report of the results of the blood test was not introduced into evidence, the drawing of the blood sample could not be presumed valid. Second, the defendant contends that the conclusive presumption is not applicable to the drawing of a blood sample.

We need not address the defendant's first argument because a review of the transcript reveals that the official report of the results of the defendant's blood test was introduced into evidence by the State during its direct examination of Susan Lefeuvre, the chemist who conducted the blood alcohol analysis of the defendant's blood sample. In addition, we find the defendant's second argument to be without merit.

RSA 265:90 (1983) provides:

"Any person who is arraigned on a charge arising under RSA 265:84, shall file notice in said court, within 10 days immediately following the receipt by said person of the results of any blood alcohol test administered to him, requiring the attendance *of the person who took the sample for said test* or of the person who conducted said test, or both. Failure to file notice shall be deemed a waiver to require their attendance at the trial; and the official report of said test issued pursuant to RSA 265:84, shall be

deemed conclusive evidence of the conduct and results of said test."

(Emphasis added.)

Because the defendant did not request the attendance at trial of the person who drew the blood sample, the trial court instructed the jury that the official report of the results of the defendant's blood analysis was conclusive with respect to the validity of the drawing of the blood sample. On appeal, the defendant argues that the trial court erred in so instructing the jury. It is the defendant's position that the "conduct" of the blood alcohol "test" does not include the *taking* of a sample for analysis, but merely refers to the actual analysis of the blood sample to determine its alcohol content.

In construing a statute, this court will examine both the language and the objective of the legislation. *See Petition of Pelletier*, 125 N.H. 565, 570, 484 A.2d 1119, 1121 (1984). As more fully discussed below, we conclude that the defendant's interpretation is inconsistent with the language and the purpose of RSA 265:90 (1983).

In enacting RSA 265:90 (1983), the legislature intended "to reduce the number of witnesses required to prove the results of tests for blood alcohol in driving under the influence cases." *State v. Amato*, 115 N.H. 639, 641, 348 A.2d 339, 340 (1975) (citing N.H.S. JOUR. 403 (1971)). To that end, RSA 265:90 (1983) makes the official report conclusive evidence of the validity of the conduct and result of a blood alcohol test where neither the State nor the defendant produces the persons mentioned in the statute. *State v. Larochelle*, 112 N.H. 392, 397–98, 297 A.2d 223, 227 (1972); *accord State v. Amato supra* (official report is conclusive evidence of conduct and result of test even though the person who tested the breathalyzer machine was not produced at trial).

The legislature specifically identified "the person who took the sample" as one of those persons whose presence at trial must be requested. RSA 265:90 (1982) (since amended). The only possible purpose the legislature could have had in including such persons was to make it clear that the presence of the person who took the sample is no longer required to prove the validity of the results of a blood alcohol test. Thus, the official report is conclusive with respect to the taking of the sample, where the defendant does not file notice requiring the presence of that person and where neither the defendant nor the State produces the person who took the sample.

"It is an elementary principle of statutory construction that all of the words of a statute must be given effect . . . ." *Merrill v.*

266

*Great Bay Disposal Serv.*, 125 N.H. 540, 543, 484 A.2d 1101, 1103 (1984). The defendant's interpretation of RSA 265:90 (1983) would render the words "the person who took the sample for said test" meaningless. Had the legislature intended that the presumption apply only to establish the validity of the lab *analysis* of the blood sample, it would not have included the persons who take the sample in setting forth the circumstances under which the presumption applies. "We are inclined to believe that the legislature did not so waste its words." *Blue Mountain Forest Ass'n v. Town of Croydon*, 117 N.H. 365, 372, 373 A.2d 1313, 1317 (1977).

Because our interpretation gives effect to language which otherwise would be without meaning, we adopt it. *Kalloch v. Board of Trustees*, 116 N.H. 443, 445, 362 A.2d 201, 203 (1976). Accordingly, we conclude that the trial court did not err in instructing the jury that the official report was conclusive with respect to the validity of the taking of the blood sample.

*Affirmed.*

SOUTER, J., did not sit; the others concurred.