Hillsborough
No. 84-383

THE STATE OF NEW HAMPSHIRE

v.

ROBERT OXLEY

December 4, 1985

*Stephen E. Merrill*, attorney general (*Steven L. Winer*, assistant attorney general, on the brief), by brief for the State.

*Joanne S. Green*, assistant appellate defender, of Concord, by brief for the defendant.

KING, C.J. The defendant, Robert Oxley, was convicted of burglary after a trial in the Superior Court (*Goode*, J.). RSA 635:1. He appeals, asserting that, because the arresting officer had neither justifiable reason for stopping him nor probable cause for arresting

him, the Superior Court (*Dalianis*, J.) should have granted his pretrial motion to suppress the admission of statements made by him and evidence seized by the police. The defendant also claims that the trial court erred in denying his motion to prohibit access to his juvenile record for consideration in sentencing. We affirm.

On March 19, 1984, at approximately 2:30 in the morning, Officer Clifton A. Moore, Jr., of the Manchester Police Department observed a tan Saab driving through the Webster Street area of Manchester. He noticed what appeared to be furniture in the back of the car "sticking out like it was going to fall out onto the road," and was concerned that it was not secure. The Saab turned onto another street and started to accelerate. Officer Moore testified that the car did not speed up in the usual manner after making the turn, and that it seemed to him that the driver was attempting to get away.

Officer Moore put his flashing blue lights on, pulled out and followed the Saab for approximately five blocks. He testified that the driver of the Saab should have noticed him, because it was dark, the blue lights were on, and they were the only two cars on the street. The Saab drove up a hill, with the furniture remaining intact, before the driver pulled over for Officer Moore.

The Webster Street area is generally residential with a few businesses. Officer Moore testified that, in the Webster Street neighborhood, traffic is light at that hour in the morning; that there "wasn't anybody really moving" on that particular night; and that "[e]verything was closed up." It had been raining heavily earlier that evening, and at 2:30 that morning the weather was still misty. Officer Moore had had patrol duty in the area since January 3, 1984, and he knew that the area had "been getting hit pretty heavily with burglaries" in the weeks just before this incident.

After the Saab pulled over, Officer Moore illuminated the area with some spotlights, reported the Saab's location and plate number, and then approached the car. He now ascertained that the items in the back of the Saab were furniture. Officer Moore asked the defendant, who was driving, for his license and registration. The defendant handed over his license and looked for his registration. As he did so, Officer Moore looked at the articles of furniture and noticed sales tags and price markings on them.

Officer Moore took the license and the keys to the car, and then asked the defendant about the furniture. The defendant said that he had bought the furniture from a man in the parking lot of the Puritan Furniture Store (Puritan Furniture), which is approximately one-half mile from Webster Street. The officer had noticed that the furniture looked expensive, so he asked the defendant if he had a bill of sale. The defendant had no sales slip, nor did he know the regis-

tration of the van from which the furniture had allegedly been sold. Officer Moore read the defendant his *Miranda* rights and then told the defendant that he didn't believe his story.

At that point, Officer Brian J. Fielding of the Manchester Police Department arrived on the scene. Officer Moore asked Officer Fielding to check out Puritan Furniture's security. Officer Fielding went to Puritan Furniture, which was a "couple of minutes" away, and discovered that it was open and had been burglarized.

After Officer Fielding had left the scene of the stop to check out Puritan Furniture, Officer Albert J. Moseley of the Manchester Police Department arrived. Officer Moseley told Officer Moore that he had seen a vehicle fitting the description of the defendant's automobile in the Puritan Furniture parking lot earlier that evening. Officer Fielding then returned and reported that Puritan Furniture had been burglarized.

The defendant said that he had not broken into Puritan Furniture, and that he had found the furniture outside the building. Officer Moore told the defendant he didn't believe his story because it had been raining all night and the furniture was dry. He then told the defendant that he was under arrest.

The defendant was charged with burglary, and the furniture in his car was seized. After a hearing, a motion to suppress was denied, and the furniture was used as evidence in the defendant's trial. A jury found the defendant guilty, and he was sentenced to 3 1/2 to 7 years in the State prison. This appeal followed.

The defendant argues that Officer Moore's initial stop violated his fourth amendment right to be free from unreasonable searches and seizures, and that the trial court therefore erred in denying his motion to suppress all evidence obtained as a result of the stop.

The defendant has raised no State constitutional issues in support of this part of his appeal. He argues only that his federal fourth amendment rights have been violated. Therefore, we need only address the federal constitutional issues in this assignment of error. *State v. Miskolczi*, 123 N.H. 626, 628, 465 A.2d 919, 920 (1983).

■■ When a police officer stops a motor vehicle and detains its occupants, he has "seized" it and its occupants within the meaning of the fourth amendment to the United States Constitution. *See Terry v. Ohio*, 392 U.S. 1, 8, 9 (1968); *Berkemer v. McCarty*, 104 S. Ct. 3138, 3149 (1984); *United States v. Mendenhall*, 466 U.S. 544, 556–57 (1980) (opinion of Stewart, J.); *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975); *State v. Koppel*, 127 N.H. 286, 499 A.2d 977 (1985) (discussing Federal constitutional law in deciding case on State constitutional grounds); *State v. Landry*, 116 N.H. 288, 289,

358 A.2d 661, 663 (1976). In this case the defendant was "seized" when Officer Moore flashed the blue lights of his cruiser and pulled the Saab over. To assess the defendant's claim, we must consider the reasonableness of Officer Moore's actions.

 The facts which are a sufficient basis to support an investigative stop need not necessarily reach the level of those needed to support an arrest. *See United States v. Hensley*, 105 S. Ct. 675, 680–81 (1985); *Adams v. Williams*, 407 U.S. 143, 145, 146, 149 (1972); *State v. Brodeur*, 126 N.H. 411, 415, 493 A.2d 1134, 1137 (1985); *State v. Landry, supra* at 290–91, 358 A.2d at 664. To justify an investigative stop, a police officer must possess "articulable facts . . . together with rational inferences from those facts [which] 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Terry v. Ohio, supra* at 21–22. Furthermore, "[t]he scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Id.* at 19 (quoting *Warden v. Hayden*, 387 U.S. 294, 310 (1967) (Fortas, J., concurring)).

Officer Moore's first "articulable fact" was his observation that the furniture in the back of the car appeared insecure. In *State v. Maynard*, 114 N.H. 525, 323 A.2d 580 (1974), this court was presented with an analogous situation. We held that officers may stop a vehicle "when they in good faith reasonably believe that the driver . . . may be ill and physically unfit to drive." *Id.* at 527, 323 A.2d at 581.

 In this case, the officer stopped a single motor vehicle for an investigative check, to ensure that the furniture did not fall onto the public highways and endanger other drivers. Officer Moore's initial reason for stopping the defendant's car, although not based on a suspicion of criminal activity, was sufficient to justify the stop.

In addition, Officer Moore also testified to specific facts giving rise to a reasonable suspicion of criminal activity. He stated that recently there had been several burglaries in the area, that it was 2:30 in the morning, that all the buildings were closed up, and that nobody was moving about. Furthermore, when the officer pulled over and watched the defendant's car proceed, he observed that it took what appeared to be evasive action.

 The United States Supreme Court has stated that officers may consider the characteristics of the area in which they encounter a vehicle, as well as the driver's behavior. *United States v. Brignoni-Ponce*, 422 U.S. at 884–85. "The driver's behavior may be relevant, as erratic driving or obvious attempts to evade officers can support

a reasonable suspicion." *Id.* at 885. "And in determining whether the officer acted reasonably in [the] circumstances, due weight must be given . . . to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry v. Ohio*, 392 U.S. at 27.

Officer Moore's concern for protecting the furniture and his suspicion of the driver's unnatural acceleration were reasonable bases warranting a limited intrusion upon the personal security of the driver. A person of reasonable caution would believe it appropriate to stop the Saab in order to check the security of the furniture and to ascertain whether the driver's evasive actions were related to any unlawful activity. The scope of Officer Moore's intrusion also was reasonable. His request for the driver's license and registration was justified by his suspicion of the driver's evasive action, and his glance at the furniture was justified by his concern about its security.

■ On the basis of these facts and circumstances, we find that the stop of the Saab was a reasonable search and seizure within the meaning of the fourth amendment. Thus, the trial court properly denied the defendant's motion to suppress on the basis of an illegal stop.

The defendant's second argument is that his arrest was based on less than probable cause, and was therefore in violation of his rights under the New Hampshire and United States Constitutions. *See* N.H. CONST. pt. I, art. 19; U.S. CONST. amend. IV. We first consider independently his claims under the Constitution of New Hampshire, *State v. Ball*, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983), citing decisions of the Supreme Court of the United States for their helpfulness in analyzing and deciding the issue. *See Michigan v. Long*, 463 U.S. 1032, 1040–41 (1983).

■ Before we can determine whether or not the defendant was arrested with probable cause, it is necessary to determine when the arrest occurred. An arrest is defined in RSA 594:1, I (Supp. 1983) as "the taking of a person into custody in order that he may be forthcoming to answer for the commission of a crime." The objective test for whether an arrest has occurred was articulated in *United States v. Mendenhall*, 446 U.S. 544 (1980), and adopted by this court in *State v. Riley*, 126 N.H. 257, 490 A.2d 1362 (1985): whether, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall, supra* at 554 (opinion of Stewart, J.). There is no requirement that an officer utter the words, "You are under arrest." *See State v. Riley*, 126 N.H. at 263, 264, 490 A.2d at 1366–67

(1985); *State v. Brodhead*, 116 N.H. 39, 40, 351 A.2d 57, 58 (1976); *Dunaway v. New York*, 442 U.S. 200, 212–13 (1979).

The defendant argues that he was arrested when Officer Moore retained his license and car keys because, as a practical matter, he was not free to leave. Officer Moore testified that he did not intend to arrest the defendant until the moment when he informed the defendant that he was under arrest. Our review of the facts convinces us that the moment of the defendant's arrest was when he was so informed by Officer Moore. At that moment, and not before, the officer evidenced an intention to take the defendant into custody, and it was also at that moment that a reasonable person would have understood that he was in custody.

■ Restraint on freedom to leave indicates that a "seizure" has occurred and, as discussed above, such a seizure can be based on less than probable cause, under *Terry* and its progeny. In this case the officer seized the defendant when he took the car keys; however, this seizure could not be construed by a reasonable person as placing the defendant in custody. It was done for the purpose of detaining the defendant briefly; therefore, the limited seizure was not an arrest, *see Berkemer v. McCarty*, 104 S. Ct. at 3148–52.

■ Since we have determined that the defendant's arrest occurred when Officer Moore announced it, it is evident that there was sufficient probable cause to make the arrest constitutional. "Probable cause to arrest exists when the arresting officer has knowledge and trustworthy information sufficient to warrant a man of reasonable caution and prudence to believe that the arrestee has committed an offense." *State v. Stevens*, 121 N.H. 287, 290, 428 A.2d 1241, 1243 (1981).

■ At the time of the defendant's arrest, the officer had heard two equivocal explanations of the defendant's possession of the furniture. He also knew that Puritan Furniture had been burglarized that night; that the defendant's car had been seen in the Puritan Furniture parking lot earlier that evening; and that the furniture had sales tags on it. These facts, in conjunction with the facts forming the basis for the initial stop, form a strong foundation for probable cause. Accordingly, the defendant was lawfully arrested, and the court below properly denied his motion to suppress on that ground. We need not make a separate federal analysis, because the protection afforded the defendant under our State Constitution is as extensive in this case as the corresponding federal constitutional protection.

The defendant's final argument on appeal is that the trial court

erred in denying his motion to prohibit access to his juvenile record for consideration in sentencing. The defendant claims that RSA 169-B:2, I and :35 (Supp. 1983), read together, prohibit access by the superior court to juvenile records for the purpose of sentencing an adult. RSA 169-B:35 provides that:

> "Except as provided in RSA 169-B:24 and RSA 169-B:39, all records pertaining to cases of delinquency shall be kept at all times so that no one shall have access to the same except officers of the institution where the minor is committed, duly accredited probation officers, parent, guardian, custodian, minor's attorney, and others entrusted with the corrective treatment of said minor. Additional access may be granted by court order or upon the written consent of the minor. Once a delinquent reaches 19 years of age, all court and individual institutional records including police records shall be sealed and placed in an inactive file."

RSA 169-B:2, I, provides that "'Court' means the district court, unless otherwise indicated."

The defendant argues that in light of the definition of "court" in RSA 169-B:2, I, the language of RSA 169-B:35 which provides that "Additional access may be granted by court order . . ." is a grant of authority to only the district court. We approved such a narrow definition of the word "court" when we interpreted RSA 169-B:14, II and :7, I (Supp. 1979) in the case of *In re Raymond K.*, 120 N.H. 456, 457, 417 A.2d 6 (1980). In that case, we held that RSA chapter 169's grant to juveniles of a right to a speedy arraignment and a speedy trial applied only to the district court and not to the superior court.

Thus, we agree with the defendant that RSA 169-B:35 does not explicitly grant authority to the superior court to order access to an adult's juvenile record. However, the superior court has such authority from another source.

Prior to the legislature's enactment of the juvenile statute, we held that a presentencing report may contain references to an adult offender's juvenile record. *State v. Ferbert*, 113 N.H. 235, 237–38, 306 A.2d 202, 204 (1973). In *Ferbert*, we noted that presentence reports may "'contain information bearing no relation whatever to the crime with which the defendant is charged; and [such reports] are furnished so that the judge may have the information in order to give a defendant a sentence suited to his particular character and potential for rehabilitation . . . .'" *Id.* (quoting *Gregg v. United States*, 394 U.S. 489, 492 (1969)).

Other jurisdictions also permit courts to use juvenile records in sentencing adult offenders. *See People v. McFarlin*, 389 Mich. 557, 575, 208 N.W.2d 504, 514 (1973) (permissible for trial courts to consider juvenile records in sentencing an adult offender even though Michigan's juvenile statute prohibits the use of juvenile records as evidence for any purpose whatever in any proceeding whatever in any court except another juvenile case); *see also Berfield v. State*, 458 P.2d 1008, 1011–12 (Alaska 1969) (juvenile records could be considered in sentencing an adult even though Alaska's juvenile law prohibits the characterization of a juvenile adjudication as a criminal conviction and also prohibits use of juvenile adjudications as evidence against the minor in a subsequent case or proceeding in any other court).

 "We will not construe a statute as abrogating the common law unless the intention to do so is clearly expressed in the statute." *Wisniewski v. Gemmill*, 123 N.H. 701, 705–06, 465 A.2d 875, 878 (1983). While RSA 169-B:35 clearly grants the district court the power to order access to juvenile records, it does not clearly abrogate the common law as expressed in *Ferbert* since it does not explicitly prohibit the superior court from using juvenile records in sentencing an adult. Indeed, in the language "Except as provided in RSA 169-B:24 . . . ," RSA 169-B:35 envisions use of juvenile records by the superior court in a different situation; namely, when a juvenile is tried as an adult after transfer to the superior court.

We recognize that the juvenile statute is designed to "provide a non-criminal means to deal with delinquent children" R. McNAMARA, 2 NEW HAMPSHIRE PRACTICE, CRIMINAL PRACTICE AND PROCEDURE § 1118, at 248 (1980). However, we will not allow this purpose to overcome competing considerations which arise in the context of a sentencing hearing following a criminal conviction.

Finally, the confidentiality of the juvenile record, outside of the sentencing hearing, is protected by the superior court rule which limits disclosure of probation reports to those individuals whose access to the records is ordered by the court. SUPER. CT. R. 112.

 For these reasons, we find that the trial court properly denied the defendant's motion to prohibit access to his juvenile records.

*Affirmed.*

JOHNSON, J., did not sit; the others concurred.