Hillsborough
No. 87-175

THE STATE OF NEW HAMPSHIRE

v.

DANIEL CHALOUX

August 10, 1988

*Stephen E. Merrill,* attorney general (*William H. Lyons,* assistant attorney general, on the brief), by brief for the State.

*Joanne Green,* assistant appellate defender, of Concord, by brief for the defendant.

SOUTER, J. Having been found guilty in the Superior Court (*Pappagianis*, J.), the defendant in this robbery case appeals the denial of his motion to suppress evidence as fruit of an unlawful arrest. We affirm.

On the evening of November 25, 1985, Edward Dionne was traveling on foot down Cohas Avenue in Manchester, en route from Haywood Street to Bodwell Road, when a grey Chevrolet pick-up truck drove up to him. Someone in the truck asked if he had any cigarettes. He did have, and as he gave some to the truck's three occupants he observed that they were all young men with light hair and slim builds. The truck drove off, only to return a few moments later. This time, the two passengers jumped out and attacked Dionne, striking his face and taking his wallet containing two twenty-dollar bills, credit cards and a plastic holder for photographs. Dionne saw the assailants reenter the truck as it drove away.

Dionne got to his house within five or ten minutes and immediately reported to the police that he had been robbed by three men, who had driven away from the scene on Cohas Avenue in a grey Chevrolet pick-up truck headed toward Bodwell Road. He mentioned that one of the assailants had a mustache. The police dispatcher directed Officer Daniel Guerin to interview Dionne and to be on the look-out for a grey Chevrolet pick-up truck with three occupants in the area the victim described. About three minutes later, on the way to Dionne's house, Guerin saw such a truck coming from the direction of Bodwell Road and pulled it over. One of the passengers was the defendant. Soon thereafter, the dispatcher advised Guerin that the truck might be carrying a ladder and that one of the robbers had a mustache. There was a ladder on the truck Guerin had pulled over, and he noted that one of the passengers, and perhaps the driver, had a mustache.

None of the occupants could produce any identification. The driver told Guerin his name was David Town, but when Guerin went to the other side of the truck and asked one of the passengers who the driver was, the passenger said he was David Trudeau. Guerin's radio request to the dispatcher for a license check on David Town prompted a response from Officer Edward Kelley, who said he knew Town and gave a physical description that failed to fit the driver of the truck.

In the meantime, four more police cruisers were on their way to the scene. When the first reinforcements arrived, the occupants of the truck were asked to step out in order to speak with the police. After Kelley arrived and looked at the driver, he told Guerin that

the driver was not Town. Guerin later testified that he arrested the driver at that point, on a charge of giving false information to a police officer. *See* RSA 265:4. Kelley then went to one of the cruisers with the driver, who finally gave his surname as Laflamme and told Kelley that his two passengers had committed the robbery.

During this time, Guerin and Officer Bruce Smith searched the passenger compartment of the truck, on the floor of which they found a picture holder from a wallet and, under the seat, a twenty-dollar bill. After the police dispatcher advised that a wallet had been taken in the robbery, the officers gave *Miranda* warnings to the passengers and questioned them about the picture holder. Each denied owning it.

When Kelley returned to the other officers, he told Guerin that Laflamme had accused the two passengers, whereupon Guerin formally arrested them. At the police station, the police found a crumpled twenty-dollar bill protruding from one of the defendant's pockets and noticed scratches on his knuckles and blood on his hands. After receiving a second *Miranda* warning, the defendant spoke with the police. He denied knowing about the robbery and claimed an alibi, and added he "would take care of the informant" who had accused him.

Prior to trial, the defendant moved on both State and federal grounds to suppress the evidence taken from the truck and from his person, as well as the observations of the police officers and his own statement, all as the fruit of an unlawful arrest, which he claimed to have occurred when the three men were ordered to leave the truck. Accepting the defendant's claim, *arguendo*, that the arrest had occurred at that point, the trial court held the arrest lawful and denied the motion. We hold that the court was entitled to reach this conclusion, and we also approve the State's alternative analysis in support of the trial court's ruling.

A few words are in order, first, about the scope of the issues raised. The defendant contends that he was arrested at the moment he was ordered to leave the truck along with its two other occupants, and he argues that the arrest at that point was unsupported by probable cause. Because he tacitly assumes that all of the evidence in question was obtained as the result of his arrest, it follows for him, without further argument, that all such evidence is subject to suppression as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 485 (1963); *State v. Chaisson*, 125 N.H. 810, 814–15, 486 A.2d 297, 301 (1984); *State v. Tapply*, 124 N.H. 318, 325, 470 A.2d 900, 905 (1983). If, however, we should conclude that the defendant was validly arrested at that point, he

raises no challenge based on the scope of the searches or of the interrogation, or on any other ground.

We should also note at the outset that although the defendant has invoked both State and federal constitutional provisions in challenging the lawfulness of the arrest, U.S. CONST. amend. IV; N.H. CONST. pt. I, art. 19, his brief makes no separate references to State and federal grounds. *See In re N.H. Disabilities Rights Center, Inc.*, 130 N.H. 328, 334, 541 A.2d 208, 212 (1988). His failure to do so is not significant, however, since there is no prior case law distinguishing the nature and extent of the State standard from its federal counterpart, and the record does not permit such an inquiry in the case before us.

In looking to the merits of the defendant's claim, we will start with the trial court's assumption that the defendant's arrest occurred when he claimed it did, at the moment the truck's occupants were ordered to get out. The court concluded that the arrest was lawfully supported at that point by probable cause to believe that a crime had occurred and that one of its perpetrators was the defendant. We agree with the trial court.

■ At the time in question, the police had stopped a truck of the color and make described by the victim, coming from the direction of the reported crime within three minutes of the relevant radio dispatch, which itself followed the crime by only five or ten minutes. The truck had the number of passengers the victim had described, at least one of whom had a mustache, as the victim had reported. The truck was loaded with a ladder, as the victim thought his assailant's truck had been, and the police knew that the driver of the truck was in all probability lying to them. He had given a name contradicted by his own passenger, and information from another police officer independently indicated that the name the driver had given was false. The trial court could thus reasonably find that "facts and circumstances within the [police officers'] knowledge, and of which [they] had reasonably trustworthy information, [warranted] a person of reasonable caution in the belief that the [persons] to be arrested had committed . . . a crime." *Brinegar v. United States*, 338 U.S. 160, 176–77 (1949), *quoted in State v. Reynolds*, 122 N.H. 1161, 1163, 453 A.2d 1319, 1320 (1982). If, then, the arrest is viewed as taking place as the defendant claims, it had support in probable cause, and its evidentiary fruits were properly admitted at trial.

We should add that the State proffers a different analysis, in declining to accept the defendant's premise that all three occupants of the truck were arrested when they were ordered out of it. The

State submits that the driver was arrested first, and the passengers later on the basis of the driver's accusation, *inter alia*. The State, in other words, accepts the police officers' understanding of what they were doing, starting with their formal arrest of the driver for giving a false name, a misdemeanor under RSA 265:4, I(b), following which the search of the truck is said to have been justified as incident to the driver's arrest, *see New York v. Belton*, 453 U.S. 454 (1981). The arrest of the defendant and the other passenger occurred later, based on probable cause derived in part from the fruits of the truck search and from the driver's statement accusing his two passengers of the robbery. On this view, the custodial search of the defendant was an incident of his own arrest, *see United States v. Edwards*, 415 U.S. 800 (1974); *United States v. Robinson*, 414 U.S. 218 (1973); *State v. Cimino*, 126 N.H. 570, 574–75, 493 A.2d 1197, 1201 (1985), as was his subsequent custodial statement.

We will be frank to say that we find this explanation more factually plausible than the analysis offered by the defendant, whose objections to it are unconvincing. First, the defendant argues that the confusion at the scene of the arrest was too great to permit an inference that the driver was arrested when the police said they arrested him. Although we will agree that the witnesses were not consistent in identifying the police officers who were present when the occupants were ordered out of the truck, it is the sequence of events that is important, and nothing in the record raises doubt that the driver was arrested and charged under RSA 265:4 before his interrogation by Kelley, or that the search of the truck occurred during the driver's subsequent interrogation. The arrest, therefore, had to precede the search, which cannot be regarded as unlawful on the ground that it preceded the arrest.

Second, the defendant argues that he must have been arrested at the time he claims, since at that point "a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *see State v. Riley*, 126 N.H. 257, 263, 490 A.2d 1362, 1366 (1985) (adopting *Mendenhall* test to determine when a seizure of the person had occurred, within pt. I, art. 19 of the State Constitution). While we agree that the defendant was not free to leave at that point, and could not reasonably have believed otherwise, it does not follow that he was arrested, for purposes of applying the fourth amendment of the National Constitution.

*Mendenhall*, like our own *Riley* case, provides a test to determine when a seizure of the person has occurred, but the category of seizures includes not only arrests, but those more

limited and less intrusive investigative stops on suspicion of crime which are justified by articulable facts that do not amount to probable cause for arrest. *Terry v. Ohio*, 392 U.S. 1, 19, 27 (1968); *see State v. Brodeur*, 126 N.H. 411, 415, 493 A.2d 1134, 1137 (1985). Thus, a reasonable perception of loss of freedom to leave signals that a seizure has occurred, but not necessarily that the seizure is an arrest, as distinguished from a more limited *Terry-Brodeur* stop for investigation. (It is true that *State v. Oxley*, 127 N.H. 407, 412, 503 A.2d 756, 760 (1985) suggests that satisfaction of the *Mendenhall* test is sufficient to demonstrate an arrest, but *Oxley* recognized *Terry* seizures, *id.* at 413, 503 A.2d at 761, and must not be read as converting the *Mendenhall-Riley* rule from a test for seizure into one for arrest in the strict sense.)

The fact that the defendant could not be viewed objectively as free to leave when he was ordered from the truck does not, therefore, require us to conclude he was arrested at that point. Although he imputes great significance to the number of police officers at the scene at that moment, what he calls the "show of force" only confirms that he was detained. *See Terry v. Ohio, supra* at 25–29. His detention may be seen merely as a stop sanctioned by *Terry*, and nothing in the record suggests that the period of time between that detention and the later formal arrest exceeded the bounds of what was reasonable for investigative purposes. *See Florida v. Royer*, 460 U.S. 491, 500 (1983); *State v. Maya*, 126 N.H. 590, 595, 493 A.2d 1139, 1143 (1985). Thus the defendant's detention may be seen as a *Terry* stop up to the point of his formal arrest, his seizure at each point having been free of any constitutional taint upon which a poisonous tree claim could be predicated.

On either analysis, the motion to suppress was soundly denied.

*Affirmed.*

All concurred.