# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-KM-01853-COA

**NIKOLAS JOHNSON A/K/A NIKOLAS LESHAWN JOHNSON**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                                   **APPELLEE**

DATE OF JUDGMENT:              11/21/2019
TRIAL JUDGE:                          HON. STEVE S. RATCLIFF III
COURT FROM WHICH APPEALED:   MADISON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:     HOWARD BROWN
ATTORNEY FOR APPELLEE:      JOHN HEDGLIN
NATURE OF THE CASE:           CRIMINAL - MISDEMEANOR
DISPOSITION:                       AFFIRMED - 03/30/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE WILSON, P.J., GREENLEE AND McDONALD, JJ.

### WILSON, P.J., FOR THE COURT:

¶1.     A Madison police officer stopped Nikolas Johnson after observing him driving at a high rate of speed and failing to maintain his lane of traffic.  Johnson was arrested for reckless driving and driving under the influence, and a subsequent test showed that his blood-alcohol concentration was above 0.13 percent.  While at the police station, Johnson argued with an officer and refused the officer's orders to stand up and enter a cell.  As a result, Johnson was also charged with disorderly conduct.  Johnson was convicted on all three charges in municipal court, and following a trial de novo in county court, he was again convicted on all charges.  The circuit court affirmed his convictions on appeal.  On appeal

here, Johnson argues that the trial judge erred by denying his motion to suppress statements he made on the side of the highway during the traffic stop and by admitting the results of his Intoxilyzer-8000 breath test. Johnson also argues that there is insufficient evidence to support his convictions on all three charges. We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. Around 2:30 a.m. on September 23, 2016, Madison Police Officer Rob Parker was assisting Officer William Hall with a traffic stop in the median of I-55 South in the City of Madison. Parker heard a vehicle striking the raised reflective lane dividers. He turned and saw a white Ford Mustang in the middle lane of I-55 South that was "driving in and out of his lane" and "traveling at a high rate of speed." The Mustang continued to accelerate as it passed Parker, and the driver, later identified as Johnson, yelled something out of the car window. Parker ran back to his patrol car and followed the Mustang because he believed that Johnson was driving recklessly.

¶3. Parker believed that Johnson posed a danger to himself and other drivers because he was driving in and out of his lane, traveling "well above" the posted speed limit of 70 miles per hour, and continuing to accelerate. Parker was still well behind the Mustang when it exited I-55 onto I-220. As Parker reached the exit ramp, he turned on his lights and siren. Parker then saw Johnson throw a cup from the window and saw liquid spill from the cup. The Mustang started to slow down and finally pulled over approximately one mile after Parker activated his lights and siren. Parker approached the vehicle at the driver's side. He noticed a liquid running down the side of the car, and as Johnson rolled down his window,

2

Parker smelled the "strong odor of intoxicating beverage." Parker asked Johnson how much he had had to drink. Johnson answered, "Enough to be, uh, sober . . . ."

¶4. Parker directed Johnson to turn the car off and give him the keys. Parker then ordered Johnson to exit the car and stand at the rear of the car. Parker believed that Johnson might be under the influence, so he called Hall, who was trained in DUI investigation.

¶5. Hall had also observed Johnson pass by the traffic stop on I-55 in Madison. Hall testified that Johnson was traveling at a high rate of speed, was unable to stay in his lane, and posed a danger to himself and others. Hall testified that Johnson was in the middle lane and "constantly hitting" the reflective lane dividers as he passed by the officers on I-55.

¶6. Hall responded to Parker's request for assistance and approached Parker and Johnson at the rear of the car. Hall could smell "an odor of intoxicating beverage" coming from Johnson. Hall asked Johnson how much he had had to drink, and Johnson said "one cup." Johnson consented to a portable breathalyzer test, which showed that he had consumed alcohol. After Hall showed Johnson the results of the test, Johnson admitted that he had been drinking vodka and Sprite and should not have been driving. Hall arrested Johnson for DUI and took him to the Madison Police Department.

¶7. Hall read Johnson his *Miranda*[1] rights, observed Johnson for twenty minutes,[2] and

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] Mississippi Code Annotated section 63-11-5(2)(a) (Supp. 2020) provides that "[a] breath analysis test must not be given to any person within fifteen (15) minutes of consumption of any substance by mouth." However, regulations promulgated by the Mississippi Department of Public Safety (DPS) extend the required observation period to twenty minutes. 31 Miss. Admin. Code Pt. 506, R.2.1.16.

advised Johnson of consequences of not taking the Intoxilyzer-8000 test. Johnson took the test, and the results showed that his blood-alcohol content was above 0.13 percent.

¶8. After Johnson had taken the Intoxilyzer test and was being booked, Parker walked through the area. Parker asked Johnson if he had thrown his "dope" out his car window. Johnson denied throwing dope from the car and denied that he smoked dope. Parker and Johnson then argued about the events leading up to the traffic stop. Johnson eventually told Parker to "shut the f*** up." Parker then approached Johnson and said, "You don't tell me to 'shut the f*** up.'" As Parker approached, Johnson raised his arm. Parker testified that Johnson "threw his right hand up," so he grabbed Johnson's hand and held it down to prevent Johnson from hitting him. Parker reprimanded Johnson, released him, and told him to "sit tight." Parker started to walk away but turned back. Parker testified that he decided to put Johnson in a holding cell because Johnson was angry and under the influence.

¶9. Parker repeatedly ordered Johnson to "stand up," but Johnson repeatedly refused. Parker then grabbed Johnson's arm, led him to a nearby holding cell, and told him to enter the cell. Johnson refused to enter the cell and then physically resisted. Parker and two other officers were eventually able to force Johnson into the cell. Parker cited Johnson's refusal to obey his orders as the basis for his disorderly conduct charge.

¶10. Hall reentered the booking area as Parker was ordering Johnson to stand up. Hall testified that Johnson was "noncompliant" and that Parker had to pick Johnson up and force him into the cell.

¶11. Johnson was charged with DUI, reckless driving, and disorderly conduct. He was

convicted in Madison Municipal Court and then appealed to county court. After a trial de novo, the county court also found Johnson guilty, and Johnson appealed to circuit court. The circuit court affirmed, and Johnson again appealed.

¶12.    On appeal, Johnson argues that his roadside statements should have been suppressed because they were not preceded by a *Miranda* warning. He also argues that the trial judge erred by admitting the results of his Intoxilyzer-8000 test because there was no proof of proper calibration.[3]    Finally, he argues that the State presented insufficient evidence to sustain his convictions on all three charges. We find no error and affirm.

## ANALYSIS

### I.    The trial judge properly denied Johnson's motion to suppress.

¶13.    Johnson argues that his constitutional rights were violated when Parker and Hall questioned him on the roadside after Parker took his keys. Johnson argues that he was entitled to a *Miranda* warning because Parker's act of taking of his keys transformed the traffic stop into a custodial interrogation. He argues that the trial judge should have suppressed his roadside statements because no warning was given.

¶14.    *Miranda* warnings "must be given before a suspect is subjected to custodial interrogation." *Batiste v. State*, 121 So. 3d 808, 857 (¶121) (Miss. 2013). However, the

---

[3] Johnson also asserts that the test results should have been excluded because Hall coerced or tricked him into taking the test by misstating the legal consequences of taking and refusing to take the test. However, Johnson waived this issue by failing to mention it in the trial court. *Moffett v. State*, 49 So. 3d 1073, 1088 (¶41) (Miss. 2010) ("The well-recognized rule is that a trial court will not be put in error on appeal for a matter not presented to it for decision."); *Triplett v. State*, 264 So. 3d 808, 815 (¶25) (Miss. Ct. App. 2018) ("It is well established that 'an objection on one or more specific grounds constitutes a waiver of all other grounds.'" (quoting *Fleming v. State*, 604 So. 2d 280, 292 (Miss. 1992))).

United States Supreme Court has held that routine traffic stops are not custodial interrogations for purposes of *Miranda*. The Supreme Court explained,

> Under the Fourth Amendment, . . . a policeman who lacks probable cause but whose observations lead him reasonably to suspect that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to investigate the circumstances that provoke suspicion. The stop and inquiry must be reasonably related in scope to the justification for their initiation. Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released. The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry*[4] stops are subject to the dictates of *Miranda*. The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not "in custody" for the purposes of *Miranda*.

*Berkemer v. McCarty*, 468 U.S. 420, 439-40 (1984) (citations, footnotes, quotation marks, and brackets omitted).

¶15. The Mississippi Supreme Court and this Court have followed *Berkemer* and likewise held that a person is not "in custody" for purposes of *Miranda* during an ordinary traffic stop. *Hart v. State*, 639 So. 2d 1313, 1315-16 (Miss. 1994); *Keys v. State*, 963 So. 2d 1193, 1197 (¶¶7-10) (Miss. Ct. App. 2007); *Levine v. City of Louisville*, 924 So. 2d 643, 644-45 (¶¶6-10) (Miss. Ct. App. 2006); *Millsap v. State*, 767 So. 2d 286, 289-90 (¶¶7-12) (Miss. Ct. App. 2000); *Williams v. State*, 763 So. 2d 202, 205-06 (¶¶12-13) (Miss. Ct. App. 2000). For example, in *Keys* we held that an officer was not required to give a *Miranda* warning during a traffic stop prior to asking the motorist whether he had been drinking. *Keys*, 963 So. 2d at

---

[4] *Terry v. Ohio*, 392 U.S. 1 (1968).

1197 (¶¶7-10). In *Millsap*, we held that a *Miranda* warning was not required during a traffic stop even though a drug dog had already indicated the presence of drugs in the subject car. *Millsap*, 767 So. 2d at 290 (¶12). And in *Levine*, we held that a *Miranda* warning was not required even though a second officer had been called to the scene to assist and "even if the officers believed that there was [already] probable cause for an arrest." *Levine*, 924 So. 2d at 644-45 (¶¶8-10). Likewise in this case, Parker and Hall were not required to give a *Miranda* warning prior to asking Johnson "a moderate number of questions" to investigate their suspicions that he was driving under the influence. *Berkemer*, 468 U.S. at 439.

¶16. Johnson argues that by taking his keys, Parker transformed the routine traffic stop into a custodial interrogation. We disagree. The traffic stop was the equivalent of a "*Terry* stop." *Berkemer*, 468 U.S. at 439. "During a *Terry* stop, officers are 'authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo . . . .'" *Wrenn v. State*, 281 So. 3d 838, 843 (¶17) (Miss. Ct. App. 2018) (brackets omitted) (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)). Parker suspected that Johnson was intoxicated, and taking Johnson's keys was a reasonable means of protecting the officers' safety during the course of the stop. This reasonable safety precaution did not transform the routine traffic stop into a custodial interrogation.[5]

---

[5] *See, e.g.*, *State v. Oxley*, 503 A.2d 756, 761 (N.H. 1985) (holding that an officer's act of taking a motorist's keys during an investigatory stop "could not be construed by a reasonable person as placing the defendant in custody" but rather "was done for the purpose of detaining the defendant briefly"); *State v. Chaput*, 604 P.2d 435, 436 (Or. Ct. App. 1979) (holding that officers' "[r]emoval of the [defendant's] car keys did not constitute custody" or trigger the requirements of *Miranda*); *Campbell v. State*, 325 S.W.3d 223, 235-36 (Tex. App. 2010) (explaining that an officer may take a potentially intoxicated motorist's car keys during an investigatory traffic stop as a safety measure); *State v. Whittington*, 401 S.W.3d

## II. The trial judge did not abuse his discretion by admitting the Intoxilyzer-8000 test results.

¶17. Johnson next argues that the trial judge should not have admitted the results of his Intoxilyzer-8000 test because the results were not accompanied by additional documentation certifying that the machine was properly calibrated. The standard of review for the admission or exclusion of evidence, including breath test results, is abuse of discretion. *Prince v. State*, 225 So. 3d 545, 550 (¶9) (Miss. Ct. App. 2017).

¶18. "Before a court may admit into evidence the results of a DUI test, the court must first determine that: (1) the proper procedures were followed; (2) the operator of the machine was properly certified to perform the test; and (3) the accuracy of the machine was properly certified." *Id.* at 549 (¶8) (footnote omitted) (citing *McIlwain v. State*, 700 So. 2d 586, 590 (¶18) (Miss. 1997)). In this appeal, Johnson challenges only the third requirement. With respect to that issue, Mississippi law provides that "[t]he Mississippi Forensics Laboratory[6] shall make periodic, but not less frequently than quarterly, tests of the methods, machines or devices used in making chemical analysis of a person's breath as shall be necessary to ensure the accuracy thereof, and shall issue its certificate to verify the accuracy of the same." Miss. Code Ann. § 63-11-19 (Supp. 2020).

¶19. At trial, the State offered the DPS Form IP-01E documenting the results of Johnson's Intoxilyzer test. Pursuant to DPS regulations, "[t]he calibration checks of Intoxilyzer-8000

---

263, 274-75 (Tex. App. 2013) (same).

[6] The Forensics Laboratory is a division of DPS. Miss. Code Ann. § 45-1-2(2)(c) (Supp. 2020).

8

instruments are performed when an instrument is installed or removed from a location, when a dry gas ethanol standard is changed *and with each breath test*." 31 Miss. Admin. Code Pt. 506, R. 10.1 (emphasis added). "The calibration checks performed with each breath test are automatically performed by the instrument during the breath test sequence. These calibration check results are recorded on each breath test on Form IP-01E." *Id.*; *see also Prince*, 225 So. 3d 545, 552-53 (¶17) (explaining that the Intoxilyzer-8000 is a "self-calibrating machine"). Consistent with these regulations, the Form IP-01E admitted in this case shows not only Johnson's tests results but also the calibration check results from before and after Johnson's test. The Form IP-01E also bears the Great Seal of the State of Mississippi and states as follows: "Calibration of instrument certified to meet acceptable standards of accuracy. This certificate approved by the Mississippi State Crime Laboratory pursuant to Implied Consent Act, Sec. 63-11-19, Mississippi Code of 1972, Annotated." The Form IP-01E also bears Hall's signature. Hall is certified by DPS to operate the Intoxilyzer-8000.

¶20.    Johnson argues that the Form IP-01E and Hall's testimony were insufficient to show that the machine was properly calibrated. He argues that the State was required to offer a separate document showing that the machine had been calibrated on at least a quarterly basis prior to the date of Johnson's test.

¶21.    We disagree. Although DPS regulations also provide for quarterly checks, *see* 31 Miss. Admin. Code Pt. 506, R. 10.1, Intoxilyzer test results are admissible at trial as long as the State presents evidence sufficient for the trial judge to find that "the accuracy of the machine was properly certified." *Prince*, 225 So. 3d at 549 (¶8) (citing *McIlwain*, 700 So.

9

2d at 590 (¶18)). On its face, the Form IP-01E shows that calibration checks were performed before and after Johnson's tests and that the accuracy of the machine was properly certified by the Forensics Laboratory. The Form IP-01E and Hall's testimony were sufficient for the trial judge to make an "initial determination that the machine was accurate" and admit the results into evidence. *Id.* at 552-53 (¶17). Therefore, the trial judge did not abuse his discretion by admitting Johnson's test results.

### III. The State presented sufficient evidence to convict Johnson on all charges.

¶22. "When testing the sufficiency of evidence, this Court views the evidence in the light most favorable to the State." *Williams v. State*, 285 So. 3d 156, 159 (¶11) (Miss. 2019). We must affirm "if any rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Id.* In addition, we must give the State "the benefit of all favorable inferences reasonably drawn from the evidence." *Id.*

### A. The State presented sufficient evidence of reckless driving.

¶23. "Any person who drives any vehicle in such a manner as to indicate either a wilful or wanton disregard for the safety of persons or property is guilty of reckless driving." Miss. Code Ann. § 63-3-1201 (Rev. 2013). "Reckless driving occurs when the driver commits conscious acts which a driver knows or should know would create an unreasonable risk of injury or damage." *Nix v. State*, 763 So. 2d 896, 900 (¶8) (Miss. Ct. App. 2000) (citing *Barnes v. State*, 249 Miss. 482, 484, 162 So. 2d 865, 866 (1964)). "Wobbling, swaying and weaving back and forth while driving also constitutes reckless driving." *Id.* (citing *Barnes*,

10

249 Miss. at 484, 162 So. 2d at 866). "There is no intent requirement in the reckless-driving statute, which simply criminalizes driving a vehicle in a manner that indicates a wilful or wanton disregard for the safety of persons or property." *Brooks v. State*, 18 So. 3d 833, 841 (¶34) (Miss. 2009).

¶24. Parker and Hall testified that Johnson was driving at an excessive rate of speed while weaving in and out of his lane. They also testified that there were other drivers on the road and that the manner in which Johnson was driving posed a danger to the other drivers. Johnson did not testify. Based on the officers' testimony, there was sufficient evidence for the trial judge to find Johnson guilty of reckless driving.

### B. The State presented sufficient evidence of disorderly conduct.

¶25. Johnson was charged with disorderly conduct for refusing to comply with Parker's orders to stand up and enter a holding cell at the jail. The charging affidavit alleged that Johnson refused to comply with Parker's orders "with intent to provoke a breach of the peace." *See* Miss. Code Ann. § 97-35-7(1) (Rev. 2020). On appeal, Johnson argues that "it is reasonable to conclude that" he did not disobey Parker's commands with "an intent to provoke a breach of the peace." Johnson argues that Parker was aggressive and that "it is more reasonable to conclude that [he disobeyed Parker's orders] out of concern for his [own] safety."[7]

¶26. We conclude that the State presented sufficient evidence to support a reasonable

---

[7] Johnson also asserts that Parker never actually ordered him to go into the holding cell. This is incorrect. Parker can be seen and heard on video directing Johnson to enter the cell, and Parker also testified that he ordered Johnson to enter the cell.

inference that Johnson intended to breach the peace. "Intent, being a state of mind, is rarely susceptible of direct proof, but ordinarily must be inferred from the acts and conduct of the party and the facts and circumstances attending them . . . ." *Bowser v. State*, 182 So. 3d 425, 432 (¶18) (Miss. 2015) (quoting *Thames v. State*, 221 Miss. 573, 577, 73 So. 2d 134, 136 (1954)); *see also Thomas v. State*, 277 So. 3d 532, 535 (¶13) (Miss. 2019) ("The bottom line is that in many cases, the State is not privy to direct evidence of intent because of the impossibility of peering inside a defendant's mind."). An arrestee being booked into a jail is not at liberty to refuse an officer's order to stand up and enter a holding cell. In the jail setting, a breach of the peace is a foreseeable consequence of such a refusal. On appeal, Johnson argues that it would be "reasonable" to infer that he did not intend to breach the peace. But when we review the sufficiency of the evidence, we must give *the State* "the benefit of all favorable inferences reasonably drawn from the evidence." *Williams*, 285 So. 3d at 159 (¶11). Based on the evidence presented—including video of the incident—it was reasonable for the trial judge to infer that Johnson intended to breach the peace by refusing Parker's lawful orders to stand and enter the holding cell. *See Shaw v. State*, 139 So. 3d 79, 84 (¶13) (Miss. Ct. App. 2013) ("The presumption of the law is that each person intends the natural consequences of his actions."). Therefore, Johnson's argument that there is insufficient evidence of intent is without merit.

### C. The State presented sufficient evidence that Johnson was guilty of DUI.

¶27. Johnson briefly asserts that there was insufficient evidence to convict him of DUI because his roadside statements and the results of his Intoxilyzer-8000 test should have been

12

excluded. However, we have already rejected those arguments, and the evidence was clearly sufficient to support the trial judge's finding that Johnson was guilty of DUI.

## CONCLUSION

¶28. The trial judge properly denied Johnson's motion to suppress because Johnson's roadside statements were not the product of a custodial interrogation. In addition, the trial judge did not abuse his discretion by admitting the results of the Intoxilyzer-8000 test because the State presented sufficient evidence for the judge to find that the machine's accuracy was properly certified. Finally, the State presented sufficient evidence for the trial judge to find Johnson guilty on all charges.

¶29. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR. EMFINGER, J., NOT PARTICIPATING.**