Merrimack
No. 84-156
No. 84-391

THE STATE OF NEW HAMPSHIRE

v.

MICHAEL MAYA

May 28, 1985

*Stephen E. Merrill*, attorney general (*Gregory W. Swope*, assistant attorney general, on the brief and orally), for the State in No. 84-156.

*James E. Duggan*, appellate defender, of Concord, by brief and orally, for the defendant in No. 84-156.

*Stephen E. Merrill*, attorney general (*Andrew L. Isaac*, assistant attorney general, on the brief), by brief for the State in No. 84-391.

*Charles A. Russell*, of Concord, by brief for the defendant in No. 84-391.

SOUTER, J. The defendant appeals two convictions following separate trials for burglary under RSA 635:1. In each case the superior court denied his motion to suppress evidence. We affirm.

At 12:40 a.m. on August 5, 1983, Officer Murphy of the New London Police Department received a report of a burglary in progress at Dexter's Jewelry Store on Main Street in New London. When he reached the store he found that someone was in it, and shortly thereafter he saw someone run from the rear of the building into the woods. The felon ignored an order to stop. Officer Murphy returned to his cruiser, radioed the information that the burglar had fled to the woods, stated that he would pursue him, and asked for help.

State Trooper Erickson heard the radio transmission and drove to the scene. He noticed a broken window in the back of the burglarized building. He then patrolled the area by car and, at 12:57 a.m., saw the defendant emerge from between two buildings located on the same side of Main Street as Dexter's. The defendant then walked down the street, away from the scene of the crime.

Trooper Erickson stopped the defendant and asked for his name and identification. The trooper noticed that the defendant was sweating and breathing hard. The defendant acted nervously and repeatedly looked up the street in the direction of Dexter's. He had a fresh abrasion on his nose, and there were drops of blood on his tee shirt.

The defendant gave his name and produced a copy of his birth certificate. He told Trooper Erickson that he was coming from a friend's house further down the street and was anxious to get home, lest he violate his father's curfew. He told the trooper that he had injured his nose in a fight earlier in the evening.

Three minutes after Trooper Erickson had stopped the defendant, and while he was examining the birth certificate, Officer Murphy came upon the scene. He recognized the defendant as the person who had fled from Dexter's, and arrested him for burglary. In a search of the defendant's clothing, incidental to the arrest, the police found a ring taken from the store. Later the police took the defendant's fingerprints, which they matched with prints taken from a window at the store.

On November 9, 1983, before trial on the Dexter's burglary charge, the defendant again ran afoul of the law. About 9:00 that evening the dispatcher at the New London Police Department heard obscenities being transmitted on the radio frequency used by the town's fire department. Office Sidmore was sent to the fire station, where he found a broken window and two portable radios missing from their rechargers. On his way back to the police station he heard more obscenity over the car radio. He parked and went inside the police station to call the fire chief. While he was inside someone smashed his cruiser windows, ripped two radio antennas from the trunk lid and broke a beer bottle against one of the wheels. After this vandalism, the officer noticed that near the cruiser were two rocks the size of grapefruit, unlike any other stones in the area, and he concluded that they had been used to break the car windows.

About 10:00, Sergeant Marshall of the New London Police Department called State Police Trooper Gary Bashaw for help, and later in the evening Trooper Bashaw arrived with his certified Alsatian tracking dog, Bart. After scenting one of the rocks, Bart picked up a scent line which he tracked to the broken window at the fire

station, and from there to a restaurant where local youths congregated.

Since it appeared to Trooper Bashaw that Bart was backtracking, the police officers and Bart returned to the cruiser and the rocks. Bart scented one of the rocks again and this time followed a different path to the house where the defendant lived with his family. It was then after midnight. When the defendant's father came out of the house to speak with the police, he said that the family had all been home that evening and that unless the police had a warrant they should leave. They left and took Bart back to the cruiser. Again he rescented one of the rocks, and again took the police to the defendant's house.

The next day, technicians at the New Hampshire State Police Laboratory examined the two rechargers from which the radios had been stolen. They found fingerprints, which they matched with the defendant's. Later that afternoon Sergeant Marshall of the New London Police Department applied for a warrant to search the defendant's house, and in support of his application gave evidence to a magistrate about Bart's tracking and the fingerprint match. The magistrate issued the warrant, and when the police searched the house they found the stolen radios. They then arrested the defendant and charged him with burglary of the fire station.

Before his first trial in the superior court, for the burglary at Dexter's, the defendant moved to suppress all evidence taken as a result of his arrest, which he claimed was illegal. *Cann*, J., denied the motion. Prior to the second trial, for the fire station burglary, the defendant moved to suppress evidence seized under the warrant. *Wyman*, J., denied this motion. We consolidated the defendant's appeals from these orders, because each motion challenged, *inter alia*, the use of the fingerprints taken after the first arrest.

We independently consider his claims first under the Constitution of New Hampshire, *State v. Ball*, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983), citing decisions of the Supreme Court of the United States and of courts of other jurisdictions for their helpfulness in analyzing and deciding the State issue. *See Michigan v. Long*, 103 S. Ct. 3469, 3475–76 (1983). Since in this case we conclude that the federal law is not more favorable to the defendant, we make no separate federal analysis.

We deal first with the motion to suppress all evidence seized as a result of what the defendant claims was the unlawful first arrest. The defendant argues that the arrest by Officer Murphy was unlawful because it would not have occurred without the preliminary detention by Trooper Erickson, which he asserts was unlawful. He thus raises a "fruit of the poisonous tree" claim, that the seizure of

evidence was tainted by the illegality of his original detention. *See State v. Chaisson*, 125 N.H. 810, 814–15, 486 A.2d 297, 301 (1984).

The State has the burden to justify Trooper Erickson's detention of the defendant as a legitimate investigative stop. *See State v. Brodeur*, 126 N.H. 411, 493 A.2d 1134 (1985); *State v. Riley*, 126 N.H. 257, 490 A.2d 1362 (1985). In *Brodeur*, we adopted the rule first established in *Terry v. Ohio*, 392 U.S. 1 (1968), that there are circumstances under which the police may temporarily detain a suspect for investigatory purposes, on grounds that do not amount to probable cause to arrest him for the commission of a crime. Such a detention is lawful under the New Hampshire Constitution, part I, article 19, only if the police have an articulable suspicion that the person detained has committed or is about to commit a crime. *State v. Brodeur*, 126 N.H at 411–16, 493 A.2d at 1137–38. "The scope of the detention must be carefully tailored to its underlying justification . . . must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983); *see also State v. Riley supra.*

To assess the defendant's claim, then, we must consider the sufficiency of Trooper Erickson's "articulable suspicion," the scope of his inquiry, and its duration. The trooper certainly had sufficient articulable suspicion that the defendant had committed a crime. The evidence indicated that the Main Street of New London was virtually deserted at the time in question. Within about fifteen minutes of a burglary the trooper saw a young man emerge from between two buildings on the side of the street where the burglary had occurred and near the scene. Trooper Erickson knew that another officer had chased a burglar into the woods, and the trooper observed that the defendant was sweaty, breathing hard, nervous, and given to glancing in the direction of the burglarized store. The trooper knew there was broken glass at the scene, and he saw an abrasion and blood on the defendant. This was an articulable basis for suspicion that the defendant had committed the burglary and had fled from the store.

We look next at the scope of the trooper's inquiry, judged in terms of its object. That object was not, as the defendant argues, merely to learn the defendant's identity. Although Trooper Erickson naturally asked for name and identification, his object was to confirm or dispel his suspicion that the defendant was the burglar. In any case, when Officer Murphy arrived, Trooper Erickson was still examining the defendant's birth certificate, and it is sufficient to say that he certainly had not learned anything to dispel his suspicion. Thus the questioning did not exceed legitimate limits.

■■ This conclusion is confirmed by the length of the stop. Length of time is an important factor in assessing the reasonableness of a temporary detention. *United States v. Place,* 103 S. Ct. 2637, 2645 (1983). The detention in this case lasted only three minutes, in which time Trooper Erickson did no more than preserve the *status quo. See Adams v. Williams,* 407 U.S. 143, 146 (1972). *Compare, e.g., United States v. Place supra* (ninety minutes too long under the circumstances). Three minutes is not much time for learning identity and assessing the plausibility of a suspect's story, and it is a bold thing to say that a three-minute investigative stop is unreasonably long. It could hardly be shorter.

■ We therefore conclude that the detention was lawful under the New Hampshire Constitution, part I, article 19. As we noted above, federal law is not more favorable to the defendant, *see generally Florida v. Royer,* 460 U.S. 491 (1983), and we therefore do not analyze the federal claim separately.

There being no question about Officer Murphy's probable cause to arrest when he found the defendant with Trooper Erickson, *see United States v. Jacquillon,* 469 F.2d 380 (5th Cir. 1972), *cert. denied,* 410 U.S. 458 (1973), there is no further reason to question the admissibility of the evidence obtained thereafter, including the ring and the fingerprints. *See State v. McComb,* 111 N.H. 312, 314, 282 A.2d 673, 675 (1971); *State v. Hutton,* 108 N.H. 279, 289, 235 A.2d 117, 123 (1967).

The significance of our conclusion that the police legally obtained the fingerprint evidence is not limited to the first of these combined appeals, however. The issues in the second appeal, challenging the validity of the warrant to search the defendant's house, include a claim that the fingerprint evidence should not have been used to establish probable cause for the issuance of the warrant. We therefore examine the validity of that warrant.

■ A search warrant application must be supported with evidence of probable cause in order to demonstrate to the issuing magistrate that there is a substantial likelihood of finding incriminating evidence at the place to be searched. *State v. Marcotte,* 123 N.H. 245, 248, 459 A.2d 278, 280 (1983). In the present case, the affidavit and testimony presented to the magistrate were intended to demonstrate two sets of related facts: that the defendant's fingerprints were on the recharging stand from which two of the fire department's radios had been stolen; and that Bart had followed a line of scent from the scenes of the burglary and vandalism to the defendant's house, within a short time of the crimes.

The defendant advances two arguments that these facts were insufficient to establish probable cause. First, he argues that the magistrate could not properly consider the fingerprint evidence, because the police had obtained that evidence following an illegal detention. For the reasons given earlier in this opinion, we reject this argument.

Second, he argues that even if the magistrate could properly consider the fingerprint evidence, the total evidence presented to the magistrate was insufficient to establish the requisite probable cause. The facts of the case do not support this argument.

The evidence before the magistrate was that fingerprints on the rechargers immediately after the burglary matched the known prints of the defendant, a young man twenty years old living with his parents. The evidence indicated that no member of the fire department had been present at the time of the burglary and that the burglar had entered by a broken window. The magistrate could therefore conclude that the building was not open to the public, and could infer that it was unlikely that at some time the defendant had been lawfully in the building. Based upon commonsense inference, there was a substantial likelihood that the prints had been left in the course of the burglary, and this evidence alone established probable cause to search the defendant's dwelling for fruits and other evidence of the crime.

Given our conclusion that the fingerprint evidence was sufficient to establish probable cause, it is not necessary for us to address the defendant's further position that the magistrate improperly considered the evidence that Bart had followed a track to the defendant's house. Nevertheless, we will deal with this issue because it may arise in future cases.

The defendant relies on *State v. Taylor*, 118 N.H. 855, 395 A.2d 505 (1978) in claiming that the tracking evidence had no value for probable cause purposes. We find this to be a misapplication of *Taylor*, however, resting on a failure to distinguish between (a) the admissibility of evidence offered at trial for the purpose of proving guilt and (b) the weight of evidence presented to a magistrate for the purpose establishing probable cause.

In *Taylor* we considered the admissibility at trial of evidence that a dog had tracked a defendant in such a way as to indicate that he was the perpetrator of a crime. We held that such evidence is admissible if there is an independent evidentiary basis, or foundation, establishing the dog's reliability.

We held that a sufficient foundation may consist "of testimony that the dogs are pureblood and of a stock characterized by

acuteness of scent and power of discrimination; that they are trained to pursue the human track; that they have had experience tracking; that they were placed on the trail where the alleged participants are known to have been; and that they were placed within the dogs' period of efficiency." *Id.* at 857, 395 A.2d at 506. (Citation omitted.)

If the question in the present case were the admissibility of the tracking evidence at trial for the purpose of proving guilt, and if the foundation evidence consisted only of what the police told the magistrate when they applied for the search warrant, we would hold the tracking evidence inadmissible. The information bearing on foundation consisted of the portion of Officer Marshall's affidavit in which he stated that he had

> "personally helped train the dog Bart by 'running' tracks for Trooper Bashaw on many occasions over the past two years. The dog has *never* failed to follow my tracks and find me in spite of my using every trick I can think of to elude him. Many of the tracks have covered a distance of 2 miles and had a starting time lapse of up to 1 hour."

In two respects, this statement would be deficient as a foundation under *Taylor*. First, it fails to tell about the dog's breed, the purity of his bloodline, and the virtues of the breed as trackers. We know that the dog was Alsatian only on the basis of other evidence on the record; there is no indication that the magistrate was told this or was given evidence that Alsatians are reliable trackers.

The second deficiency is more serious. There was no evidence that the dog was asked to perform within his "period of efficiency," that is, within the period of time in which he had previously demonstrated that he could follow a scent reliably. The affidavit indicates that Bart could follow a track despite one hour of lead time, but it does not indicate that in this instance his tracking was performed within an hour. Perhaps some of these deficiencies could have been cured if the police had told the magistrate what standards a dog must meet in order to be "certified" as a tracking dog. But as it was, the combination of these failures to satisfy the *Taylor* standard for foundation would have rendered the tracking evidence inadmissible to prove guilt at trial.

■■ It does not follow, however, that the tracking evidence was without value for the quite different purpose of establishing probable cause to issue the search warrant. The test of admissibility for the purpose of proving guilt is not the test of value for the purpose of establishing probable cause. *See Brinegar v. United States*, 338 U.S. 160, 172–76 (1949); *see also State v. St. Arnault*, 114 N.H. 216, 217–18, 317 A.2d 789, 790 (1974). We do not have occasion to

decide here whether the "fruit of the poisonous tree" doctrine would forbid reliance on illegally obtained evidence for the purpose of establishing probable cause. *See* R. MCNAMARA, 1 NEW HAMPSHIRE PRACTICE, CRIMINAL PRACTICE AND PROCEDURE § 417 (1980). But it is clear that when there are no such considerations of constitutional policy, relevant evidence may be weighed for probable cause purposes without regard to its admissibility as trial evidence.

In the present case, the evidence of the dog's tracking had some weight entitling it to consideration. The deficiencies in the related foundation evidence certainly deflated the value of the tracking evidence, but it did not reduce its value to nothing. Although the magistrate did not know about Bart's ancestry and could have not have been certain whether his performance occurred within the range of his demonstrated ability, the magistrate could tell from the affidavit that Bart had some skill as a tracking dog and had done his tracking on the evening of the crimes.

Thus the tracking evidence was entitled to some weight as an indication that the perpetrator of the burglary had walked to the police station and thence to the defendant's house. It was not enough weight to amount to probable cause, but it was nonetheless some confirmation for that conclusion, which the fingerprint evidence was independently sufficient to establish.

As a final challenge to the warrant, the defendant asserts that the evidence offered to establish probable cause was stale. The short answer to this claim is that less than twenty-four hours had passed from the burglary on November 9, until the issuance and execution of the warrant on November 10. Since it is not unlikely that a thief will possess the fruits of his crime for a day, it was realistic to conclude that such items would still be at the defendant's house on November 10. We will interpret the evidence submitted in support of a warrant in a commonsense manner, giving consideration to the preference to be accorded warrants. *State v. Marcotte*, 123 N.H. at 248, 459 A.2d at 280. When judged on a realistic standard, the evidence of probable cause had not become stale.

We find no error and affirm the judgments below.

*Affirmed.*

All concurred.