Cheshire
No. 92-394

THE STATE OF NEW HAMPSHIRE

v.

SEAN CHRISTY

March 25, 1994

*Jeffrey R. Howard*, attorney general (*Jane E. Young*, assistant attorney general, on the brief and orally), for the State.

*Albert E. Scherr*, assistant appellate defender, of Concord, by brief and orally, for the defendant.

HORTON, J. The defendant, Sean Christy, was charged with possession of cocaine, possession of cocaine with intent to dispense, and possession of psilocybin with intent to dispense. The Superior Court (*Hollman,* J.) denied the defendant's motions to suppress evidence, and the defendant was found guilty by the Superior Court (*Sullivan,* J.) upon an agreed stipulation of facts. On appeal, the defendant argues that his arrest, which was effectuated without a warrant and in reliance on information from an anonymous informant, was unconstitutional, and that evidence seized following his arrest should have been suppressed. We affirm.

On February 15, 1990, an anonymous caller telephoned the New London "Crimeline" to report that the defendant was selling cocaine from his apartment on Main Street in New London. According to the Crimeline's notes of the call, about once every two weeks the defendant, whom the caller referred to as "Shawn," rode the Amtrak train from White River Junction, Vermont, to New York City to purchase cocaine. The defendant usually stayed in New York City for two days at a time and purchased cocaine worth approximately $2000. Upon returning to New Hampshire, the defendant sold the cocaine in one gram or half gram quantities, using high school students as sales agents. The caller said the defendant drove a black Subaru, and described him as a twenty-eight-year-old white male, approximately five feet, nine inches tall, weighing 165 pounds, with curly black hair and blue eyes. The caller promised to contact the Crimeline when the defendant next traveled to New York City. On February 20, 1990, the caller telephoned the Crimeline and said that the defendant was scheduled to return to White River Junction from New York City on February 22, 1990. Although the caller said the defendant's train would arrive at 5:00 p.m., police officers concluded from their own knowledge of the Amtrak train schedule that the New York train arrived in White River Junction at 5:00 a.m. The caller said that she planned to meet the defendant at the train station and would be driving his Subaru. She added that they would return to New London on the interstate highway. The caller said she would be wearing a black skirt and sweater, and described herself as five feet, eight inches tall, weighing 125 pounds, with light brown hair and green eyes.

Prior to the Crimeline calls, State and local police had received several reports of drug activity involving the defendant. During the summer of 1989, an anonymous source called Trooper Mathews at the New Hampshire State Police and reported that the defendant was selling drugs from his apartment on Main Street in New London. The source said that the defendant owned a black Subaru, and

that he traveled to New York City on the Amtrak train to purchase the drugs. A second anonymous source called Trooper Mathews later that summer to report that the defendant was selling drugs from his Main Street apartment. Trooper Mathews was familiar with the defendant. Earlier in 1989, while undercover, he had attempted to arrange a drug transaction with an individual who was driving the defendant's Subaru and who claimed that he could obtain drugs from the defendant. After receiving the two anonymous reports, Trooper Mathews corroborated that a black Subaru was registered to the defendant, and that the defendant lived on Main Street in New London.

A few months later, in October 1989, the State police received a telephone call from a clerk at the New London District Court who resided in the same apartment building as the defendant. The clerk said that she and other residents in the building had recently observed a suspicious pattern of activity around the defendant's apartment. For periods lasting approximately a week at a time, the clerk said, a constant flow of people could be seen coming and going from the defendant's apartment at all hours of the day and night. The people generally arrived by car and remained with the defendant for only a few minutes. After the clerk's call, the State police received an anonymous report from an individual who said he had heard that the defendant's roommate, Robert Levasseur, was selling drugs from the Main Street apartment.

In November 1989, a confidential informant went to the New London Police Department and reported having observed seventeen people enter and exit the defendant's apartment during one ninety-minute period. A short time later, this informant again went to the New London Police and said that the defendant had told him that over the course of a few days he had made $6400 selling cocaine. Finally, on January 25, 1990, an anonymous caller reported to the New London Police that the defendant had illegal drugs in his apartment. Police officers spent several hours observing the defendant's apartment but saw no evidence of suspicious activity.

On February 22, 1990, two days after the second call to the New London Crimeline, New London Police Officer David Seastrand went with Trooper Mathews and State Police Lieutenant Healey to the Amtrak train station to await the 5:00 a.m. train from New York City. Earlier that morning, Officer Seastrand had driven past the defendant's apartment and had seen the defendant's Subaru and a second car, a Dodge Omni, parked in front of the building. The Dodge was registered to Anastasia Kerr. Officer Seastrand was familiar with

Anastasia Kerr, having earlier arrested her for issuing a bad check. He knew that Anastasia Kerr and her brother, David Kerr, were associates of the defendant. Seastrand brought a photograph of Anastasia Kerr to the train station, and he told Trooper Mathews that he expected she would be meeting the defendant.

A few minutes before 5:00 a.m., the officers saw the defendant's Subaru arrive at the train station. The car was driven by Anastasia Kerr, whom the officers recognized from the photograph provided by Officer Seastrand. She was accompanied by her brother, David Kerr. The New York train arrived on schedule, and the officers watched the defendant leave the train carrying a gray shoulder bag. His appearance generally matched the description provided by the Crimeline caller, except that he had a moustache and a goatee-type beard. The defendant walked to the parking lot and got into the Subaru's passenger seat.

The officers had anticipated that the defendant and his companions would return directly to New London on Interstate 89. After confirming the defendant's arrival on the New York train, Trooper Mathews had arranged for a State police cruiser to stop the Subaru when it entered New Hampshire on Interstate 89. Anastasia Kerr, however, did not drive immediately into New Hampshire. Instead, she drove south through Vermont on Interstate 91. The officers followed the Subaru, and an hour later, when it left the highway and headed into New Hampshire, they radioed the Keene Police Department for assistance. As the Subaru pulled into a convenience store in Keene, two police cruisers arrived displaying flashing lights. The cruisers blocked the Subaru's path, and Trooper Mathews and Lieutenant Healey ordered the defendant and the Kerrs to remain in the car with their hands up. As the officers approached the car with their guns drawn, the defendant pushed open the passenger door and attempted to get out. He was placed face down on the pavement and handcuffed. While Anastasia and David Kerr were removed from the Subaru and handcuffed, Trooper Mathews walked around the car and used a flashlight to look inside. The car doors were open, and the defendant's shoulder bag was lying unzipped on the back seat. Trooper Mathews saw that it held an open brown paper sack containing several small plastic bags, some filled with a white powder which he suspected was cocaine, and others filled with mushrooms which he suspected contained psilocybin. Trooper Mathews confiscated the shoulder bag, and the three individuals were arrested and taken to the Keene Police Department. The Subaru was also taken to the police department, and its subsequent search revealed a jacket that

belonged to the defendant and contained a vial of cocaine and a handwritten train schedule. The officers also searched the defendant's shoulder bag and found one bag of cocaine, two bags of marijuana, twenty-two bags of psilocybin mushrooms, and drug-related paraphernalia. The defendant was charged with possession of cocaine, possession of cocaine with intent to dispense, and possession of psilocybin with intent to dispense.

Prior to trial, the defendant moved to suppress all evidence obtained as a result of his warrantless arrest. The superior court denied the motions, holding that the police had probable cause to arrest the defendant when they stopped his car, and that the search of his car was permissible as a search incident to a lawful arrest.

On appeal, the defendant challenges only the finding of probable cause, arguing that it was based upon information provided by an anonymous informant of unknown reliability. Accordingly, he concludes that his arrest was illegal under both part I, article 19 of the State Constitution and the fourth amendment to the Federal Constitution, and that evidence obtained incident to his illegal arrest should have been suppressed. We address the defendant's State constitutional claim first, see State v. Ball, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983), citing federal law only to aid our analysis. See State v. Maya, 126 N.H. 590, 594, 493 A.2d 1139, 1143 (1985). Because federal law is not more favorable to the defendant in this area, see id., we need not analyze his federal constitutional claim.

A warrantless arrest by a police officer is ordinarily lawful if the officer has "reasonable ground" to believe that the person arrested has committed a felony. RSA 594:10, II(b) (1986). "Reasonable ground" is equated with "probable cause," State v. Vachon, 130 N.H. 37, 40, 533 A.2d 384, 386 (1987), which is met when "the arresting officer has knowledge and trustworthy information sufficient to warrant a person of reasonable caution and prudence in believing that the arrestee has committed an offense." Id. So long as the arresting officer has such knowledge, it does not matter that the arresting officer has failed to draw certain conclusions that a reasonable person would have.

■ A totality-of-the-circumstances test is applied under the Federal and State Constitutions for determining whether information from an informant supports a finding of probable cause. See Illinois v. Gates, 462 U.S. 213 (1983); State v. Carroll, 131 N.H. 179, 552 A.2d 69 (1987). Gates abolished the rule that an informant's tip will support a finding of probable cause only if the informant's "basis of knowledge" had been adequately revealed, and there were sufficient

facts to establish the informant's veracity. *Gates*, 462 U.S. at 238–39. In adopting the totality-of-the-circumstances test, however, we cautioned that "the elements of 'veracity' and 'basis of knowledge' will remain . . . as important factors . . . in determining whether probable cause exists in such cases," *Carroll*, 131 N.H. at 187, 552 A.2d at 74, adding that "other indicia of reliability, such as corroboration by police officers, may be used to supply the missing factors relative to the informant and the informant's information in determining the existence of probable cause." *Id.*

■■ We first consider the strength of the "basis of knowledge" factor. An informant's basis of knowledge reasonably can be inferred where the tip includes such a wealth of intimate detail that it reasonably implies firsthand knowledge. *See Illinois v. Gates*, 462 U.S. at 229 n.4; *State v. Kennison*, 134 N.H. 243, 248, 590 A.2d 1099, 1102 (1991); 1 W. LaFave, Search and Seizure § 3.3(e) at 670–76 (1987). In other words, an informant's firsthand knowledge can be inferred where, as here, the tip carefully describes personal information about a defendant that we would expect to be known only by those who had actually observed the described conduct or to whom the defendant had confided. In the present case, the informant's description of the defendant's *modus operandi*—Amtrak trips every two weeks from White River Junction to New York, where he would stay for two days to buy $2000 worth of cocaine which in turn would be sold in gram and half gram quantities by high school students and out of his apartment—is a strong implication of firsthand knowledge.

■ The conclusion that the informant's basis of knowledge was personal observation is also supported by evidence of a close relationship between the caller and the defendant. First, although neither giving her name nor describing her relationship with the defendant, the caller said that she planned to drive the defendant's Subaru to pick him up at the station. Later, when the police recognized Anastasia Kerr as the driver of the defendant's Subaru at the train station, a reasonable person could well have concluded that Anastasia was the Crimeline caller. Finally, the fact that Anastasia's car was parked in the defendant's driveway at 3:30 a.m. suggested that her relationship with the defendant was more than a casual one. Where evidence, as here, points to such a close relationship between informant and defendant, we have little difficulty inferring that the basis of the informant's knowledge was firsthand.

■ Turning now to the veracity factor, we recognize that the Crimeline caller neither had an established track record with the

police, *see Draper v. United States*, 358 U.S. 307 (1959), nor had offered to demonstrate her reliability, *see State v. Hazen*, 131 N.H. 196, 202, 552 A.2d 77, 80–81 (1988) (informant performed "controlled buy" for police). Veracity can also be established, however, where the police are able to corroborate details provided by the informant. *See id.* at 201, 552 A.2d at 80. Corroboration of incriminating details carries the most weight, but corroboration of "innocent detail" may also lend credence to the informant's other statements. *Id; see also Spinelli v. United States*, 393 U.S. 410, 427 (1969). Corroboration of details readily available to many people is less compelling than corroboration of details that would only be known to those privy to personal information about the defendant. *See Gates*, 462 U.S. at 245; *Kennison*, 134 N.H. at 247, 590 A.2d at 1101. Accordingly, considerable weight is afforded to an informant's ability to "predict [the defendant's] *future behavior*, because it demonstrate[s] inside information—a special familiarity with [the defendant's] affairs." *Alabama v. White*, 496 U.S. 325, 332 (1990).

 Further, and more important than the underlying determinations that an adequate basis of knowledge existed and that there were indications of veracity, because the police were able to corroborate, prior to arrest, many details provided by the informant material to the suspected crime itself, the police could reasonably conclude that the ultimate incriminating detail—that the defendant would have cocaine in his possession—was true. To begin with, the police were able to corroborate several innocent details which, although readily available, were nonetheless related accurately by the informant: that a "Shawn" lived in the described Main St. apartment, that a black Subaru was registered to Sean Christy, and that White River Junction was serviced by Amtrak trains from New York. More importantly, though, the police were able to corroborate details that demonstrated a special familiarity with the defendant's affairs. To begin with, the informant correctly predicted that the defendant would be arriving in White River Junction by Amtrak from New York on February 22. Although the Crimeline operator recorded the arrival time as 5:00 p.m., not 5:00 a.m., this error may have been attributable to either the informant or the operator, and in any event the "5:00" was correct. Further, the informant correctly predicted that the defendant had arranged to be picked up at the station by a woman who would be driving the defendant's black Subaru.

Although the information supplied by previous informants could not, by itself, have supported a finding of probable cause, *see Kennison*, 134 N.H. at 248–49, 590 A.2d at 1102, we also cannot ignore

the fact that such information tended to corroborate the Crimeline caller's ultimate allegations—that Sean Christy sold drugs and would have them on his person that morning. Following a tip during the spring of 1989, for example, Trooper Mathews had gone undercover to try to arrange a drug purchase from a particular subject. Although the deal later fell through, the subject arrived in Christy's black Subaru and told Mathews that Christy was his source. A non-exhaustive list of other corroborating sources also includes: a summer 1989 anonymous informant who first suggested that Christy was travelling to New York by Amtrak to purchase drugs later to be sold out of the apartment; the court clerk's personal observation of a heavy flow of visitors through the defendant's apartment at all hours; and a November 1989 confidential informant who told police that the defendant had boasted to him that he had made $6400 selling cocaine in just a few days.

■ Finally, we note that the informant's tip included a declaration against penal interest; namely, that despite knowing that the defendant would be returning with $2000 worth of cocaine, she planned to aid him by picking him up at the train station. We have consistently held that "[i]t is reasonable to infer the credibility of an informant where [she] makes an admission against [her] own penal interest." *Hazen*, 131 N.H. at 201, 552 A.2d at 80. This inference exists whether the informant is known or anonymous. *Id.*

In sum, by the time of the arrest, the police could reasonably have concluded that the Crimeline caller was Anastasia Kerr, that Kerr shared a close relationship with the defendant, and that even the incompletely corroborated statements in the Crimeline tip were true. Accordingly, we hold that there was probable cause to support an arrest of the defendant in Keene. In so holding, we are not unmindful of the fact that in her physical description of the defendant the informant failed to indicate that he wore a beard, and that she incorrectly predicted that they would return by way of Interstate 89. While such omissions and inaccuracies do, to some degree, undermine the informant's veracity, we hold that probable cause nonetheless existed.

The defendant urges that the outcome of this case is driven by our prior decision in *State v. Kennison*, which concerned an investigatory stop carried out in reliance on a tip from an anonymous informant. In *Kennison*, the informant alleged that he had seen marijuana in the defendant's car. 134 N.H. at 245, 590 A.2d at 1100. He described the defendant's car and work address and said that the defendant would leave work at a specified time to return home and then depart to deliver the marijuana. *Id.* In the past, the police had re-

ceived a confidential tip from a reliable informant and other anonymous reports concerning the defendant's drug dealings. *Id.* We held that reasonable suspicion did not exist to support the investigatory stop.

We find the present case easily distinguishable from *Kennison*. First, and most importantly, the only details that the police were able to corroborate in *Kennison* were those—such as type of car and employment schedule—that are readily available to many people. In contrast, the Crimeline caller in the present case accurately predicted future behavior of the defendant—including that he would arrive in White River Junction by Amtrak and be met by a woman driving his black Subaru—that showed a special familiarity with his affairs. Second, while the informant's identity and relationship with the defendant in *Kennison* remained unknown, the police in the present case had knowledge from which they could have reasonably determined the identity of the informant and that she shared a close relationship with the defendant. Third, unlike *Kennison*, the Crimeline tips included a declaration against penal interest that pointed to the reliability of the informant's other statements. Finally, in *Kennison* the level of suspicion independent of the ultimate tip cannot compare to that in the present case where the police had received several other tips—some anonymous, some not—within a narrow timeframe.

Because the defendant does not claim that the search incident to his arrest was illegal even if there was a valid arrest, we do not address that issue. *See State v. Field*, 132 N.H. 760, 765, 571 A.2d 1276, 1279 (1990).

*Affirmed.*

All concurred.