**UNITED STATES of America, Plaintiff,**

**v.**

**Jeffery ZIMMERMAN, Defendant.**

**Case No. 5:14–PO–01505–MLC**

United States District Court, D. Wyoming.

Signed July 13, 2015

Francis Leland Pico, Paige Hammer, Caitlin Hurlock, U.S. Attorney's Office, Yellowstone, NP, for Plaintiff.

Jami L. Rebsom, Jami Rebsom Law Firm PLLC, Livingston, MT, for Defendant.

## ORDER ON MOTION TO SUPPRESS

MARK L. CARMAN, UNITED STATES MAGISTRATE JUDGE

This matter comes before this Court upon the Defendant's *Motion to Suppress and Dismiss.* An evidentiary hearing was held on June 26, 2015. During the hearing the government presented the testimony of Park County Deputy Sheriff Benjamin Bailey and National Park Service Ranger Joseph Bueter.

## FACTS

Shortly after midnight on December 6, 2014, Deputy Benjamin Bailey of the Montana Park County Sheriff's Office observed a vehicle parked across the street from the Blue Goose Saloon. While the Saloon is located in the unincorporated town of Gardiner, Montana, the car was parked within the exterior boundaries of Yellowstone National Park, which is a special maritime and territorial jurisdiction of the United States. Deputy Bailey observed that the car was running and that there was one individual in the car who was seated in the driver's seat with his head resting on the steering wheel. Deputy Bailey was able to wake up the driver, who appeared "groggy". The driver rolled down his passenger window approximately one inch. Deputy Bailey inquired if the driver was okay, and the driver responded that he was. Deputy Bailey did not detect the odor of alcohol during this brief encounter. Before Deputy Bailey could complete any further investigation he received a radio call to assist Yellowstone Park Ranger Joe Bueter regarding a vehicle located at the Boiling River parking lot, approximately two miles from Gardiner. Deputy Bailey drove to Ranger Bueter's location, at which time he advised Ranger Bueter of the car parked in front of the Blue Goose Saloon with the engine running. Deputy Bailey testified that he was aware that Ranger Bueter's was a licensed paramedic. After receiving the information from Deputy Bailey regarding the parked vehicle in front of the Blue Goose Saloon, Ranger Bueter was concerned about the driver and determined that they should return to Gardiner.

They arrived at the parked vehicle approximately twenty minutes after Deputy Bailey had spoken to the driver and identified as the occupant to be the Defendant, Mr. Jeffrey Zimmerman. A registration check established that the vehicle was registered to the Defendant. In addition to being concerned about the occupant's health and welfare, Ranger Bueter testified that he was also investigating a potential out of bounds camping violation. The vehicle was still parked in the same location with the engine running and the driver resting his head on the top of the steering wheel. The vehicle's interior dome light was on. Ranger Bueter used his flashlight to check the interior the vehicle for visible weapons and ensure that the vehicle was not in gear. The driver did not initially respond to the flashlight or the presence of the officers around the vehicle. Ranger Bueter was able to rouse the driver by knocking on the window and talking. Ranger Bueter requested the driver exit the vehicle. Mr. Zimmerman was asked if he was okay and he replied that he was. Ranger Bueter observed the odor of an alcoholic beverage immediately upon Mr. Zimmerman exiting the vehicle. Mr. Zimmerman volunteered that he had been drinking and admitted to consuming two beers within the last hour at the Blue Goose Saloon. Deputy Bailey explained to Mr. Zimmerman they were concerned he may be having a medical emergency. Mr. Zimmerman was requested to provide his license and vehicle insurance information during which he exhibited poor coordination and fumbling. He was requested to perform standardized field sobriety tests, including horizontal gaze nystagmus, one-leg stand and walk-and-turn. The Defendant exhibited clues indicative of intoxication on each of the field sobriety tests. A preliminary breath test, or PBT, administered to Mr. Zimmerman yielded a result of 0.16 BAC, twice the legal limit of 0.08 BAC. Mr. Zimmerman was arrested and transported to the Mammoth detention facility within Yellowstone National Park. After the book-in process was completed and he was advised of the federal chemical testing requirements. In particular he was read the following statement:

1. You are required to Federal Law to submit to one or more chemical tests OF THE OFFICER'S DETERMINATION to determine the alcohol or drug content of your blood. Any sobriety tests given in the field prior to your arrest DO NOT apply under the requirement.

2. If you refuse to submit to a test, or fail to complete a test, you will still be charged with D.U.I., Title 36 Code Federal Regulations, Part 2, Section 4.23(a)(1), and you will also be charged with an additional offense for refusing the test, which carries a maximum penalty of six (6) months in jail and/or a $5,000.00 fine.

3. Federal Law, Title 18 United States Code, Section 3118, provides that whoever is arrested for D.U.I. in a Federal area and refuses to submit to a chemical test(s), (breath, blood or urine), shall result in the suspension of driving privileges in all federal areas in the United States for a period of one year.

4. If you are incapable of completing the test chosen, you must submit to and complete one or more of the remaining test(s) available.

5. If you refuse to submit to a test, the refusal may be used against you in court for the D.U.I. violation

6. The state that issued your driver's license may take administrative action and suspend your driver's license.

After reading the advisement, the Ranger advised Mr. Zimmerman that he had the right to refuse the test. Mr. Zimmerman replied that he would complete a test. Mr. Zimmerman agreed to submit to the offered blood test; the blood test was collected by Ranger Wilson, who was qualified to draw blood by the National Park Service. After Mr. Zimmerman agreed to provide a blood sample he expressed concerns about his job. At that time Ranger Bueter explained what would happen in regards to probable bail procedures and, that while he could not make a promise, he had never seen a Park Service employee lose their job as a result of a D.U.I. arrest. In addition, Ranger Bueter agreed to speak on the Defendant's behalf. Mr. Zimmerman never indicated any confusion regarding the testing advisement or any reluctance to provide the requested test. The conversations at the jail facility were friendly and cooperative at all times. The jail staff treated Mr. Zimmerman politely and with respect and Mr. Zimmerman reciprocated.

Laboratory analysis established Mr. Zimmerman's blood alcohol concentration to be 0.145 grams per 100 ml of blood, which is in excess of the legal limit for operation of a motor vehicle. Mr. Zimmerman was not offered an opportunity to obtain his own chemical test of his blood alcohol content.

## DISCUSSION

The Defendant asserts three grounds for the suppression of the chemical alcohol test. First, the Ranger did not have a particularized suspicion to approach or to continue the discussion with the Defendant; second, the Defendant should have been advised of the Montana implied consent law; and finally, the federal implied consent advisement does not comply with constitutional requirements [1].

1. The Defendant was not aware of the federal implied consent advisement at the time of the filing of the motion. At the hearing on the motion the Defendant acknowledged the federal implied consent advisement, but asserted it was defective and it is that argument which is addressed by the Court in this order.

## Reasonable Suspicion

The parties address this matter as an investigatory detention pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and its progeny. The initial contact by the county sheriffs deputy was motivated by a concern for the welfare of Mr. Zimmerman. This is understandable as Mr. Zimmerman was sitting in a running vehicle with his head resting on the top of the steering wheel after midnight during the winter. The dome light was on and the windows were closed. The Deputy got Mr. Zimmerman's attention though he appeared "groggy" and only rolled his window down about an inch. Mr. Zimmerman reported that he was okay. Before Deputy Bailey could investigate further he received the call to assist Ranger Bueter. The Defendant does not challenge the Deputy's actions.

Deputy Bailey informed Ranger Bueter of the situation upon their meeting at the Boiling River being aware of Ranger Bueter's medical training. Ranger Bueter immediately decided that Defendant's matter was the priority and both law enforcement officers returned to Defendant's car. Ranger Bueter had three concerns at that time. First, Mr. Zimmerman may be in distress; second, Mr. Zimmerman was engaged in out-of-bounds camping; and third, was Mr. Zimmerman in physical control of an automobile while under the influence of alcohol?

Ranger Bueter was able to get Mr. Zimmerman to respond and requested that Mr. Zimmerman exit the vehicle. Mr. Zimmerman complied and while doing so was asked if he was okay to which Mr. Zimmerman responded he was okay. Mr. Zimmerman was asked what was going on to which he replied that he had been drinking. Ranger Bueter testified that he smelled the odor of an alcoholic beverage on Mr. Zimmerman immediately upon the defendant's exit from the vehicle. Approximately thirty seconds elapses from the time of Ranger Bueter's first words to Mr. Zimmerman's stating he had been drinking. The defense is primarily focused on this time frame. In addition, the Defendant asserts that the officers did not have any reason to reestablish contact with him, as he had already advised Deputy Bailey that he was okay.

 There are a number of potential types of contacts between law enforcement officers and the public which implicate the Fourth Amendment [2]. Arrest is the most intrusive and is only reasonable if supported by probable cause. *United States v. Davis*, 94 F.3d 1465, 1468 (10th Cir.1996). The next level of contact is that of the investigatory detention which may result from a reasonable suspicion that the detained individual is engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir.2000). Additionally an officer may effect a brief, non-investigative detention while exercising their community caretaking function, regardless of suspected criminal activity. This type of detention only requires articulable facts indicating the need to assure the safety of the person or the public. *United States v. King*, 990 F.2d 1552, 1560 (10th Cir.1993).

"Encounters are initiated by the police for a wide variety of purposes, some of which are wholly unrelated to the desire to prosecute for crime." *Terry*, 392 U.S. at 13, 88 S.Ct. at 1875 (footnote omitted). See also I *ABA Standards for Criminal Justice*, § 1–1.1(c) at 18 (2d ed.1986) ("those aspects of police func-

---

**2.** There can be purely consensual contacts between law enforcement and the public which do not implicate the Fourth Amend-

ment. *Florida v. Rodriguez*, 469 U.S. 1, 5, 105 S.Ct. 308, 311, 83 L.Ed.2d 165 (1984).

tion that relate to minimizing the likelihood of disorder ... are equal in their importance to the police function in identifying and punishing wrongdoers"). Indeed, police officers are not only permitted, but expected, to exercise what the Supreme Court has termed "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973). In the course of exercising this noninvestigatory function, a police officer may have occasion to seize a person, as the Supreme Court has defined the term for Fourth Amendment purposes, in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity. See, e.g., *United States v. Rideau,* 949 F.2d 718, 720 (5th Cir.1991) (officers stopped defendant for his own safety and the safety of others after observing him standing in the middle of the road at night, dressed in dark clothes, and apparently intoxicated), vacated on other grounds, 969 F.2d 1572 (5th Cir.1992) (en banc) (agreeing with panel on this point); *United States v. Wallace,* 889 F.2d 580, 582 (5th Cir.1989) (officers detained defendant for his own safety after being informed that he possessed gun and had threatened suicide), cert. denied, 497 U.S. 1006, 110 S.Ct. 3243, 111 L.Ed.2d 753 (1990). The fact that the officer may not suspect the individual of criminal activity does not render such a seizure unreasonable per se as *Terry* only requires "specific and articulable facts which ... reasonably warrant [an] intrusion" into the individual's liberty. *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880. See also *Rideau,* 969 F.2d at 1574; *Wallace,* 889 F.2d at 582. Cf. *State v. Vistuba,* 251 Kan. 821, 840 P.2d 511, 514 (1992) (safety reasons based on specific, articulable facts may justify vehicle stop); *State v. Marcello,* [157 Vt. 657] 599 A.2d 357, 358 (Vt.1991) (same); *State v. Pinkham,* 565 A.2d 318, 319 (Me.1989); *State v. Oxley,* 127 N.H. 407, 503 A.2d 756, 759 (1989 [1985]) (same).

However, a person's Fourth Amendment rights are not eviscerated simply because a police officer may be acting in a noninvestigatory capacity for "[i]t is surely anomalous to say that the individual ... [is] fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior." *Camara* [*v. Municipal Court of City and County of San Francisco* ], 387 U.S. [523] at 530, 87 S.Ct. [1727] at 1731 [18 L.Ed.2d 930 (1967)] (footnote omitted). Whether the seizure of a person by a police officer acting in his or her noninvestigatory capacity is reasonable depends on whether it is based on specific articulable facts and requires a reviewing court to balance the governmental interest in the police officer's exercise of his or her "community caretaking function" and the individual's interest in being free from arbitrary government interference. See [*United States v.*] *Brignoni–Ponce,* 422 U.S. [873] at 878, 95 S.Ct. [2574] at 2578 [45 L.Ed.2d 607 (1975)]; *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880.

*United States v. King,* 990 F.2d 1552, 1560 (10th Cir.1993).

■ Ranger Bueter's contact with the Defendant in December of 2014 was multifaceted and can be evaluated under both the investigatory and non-investigatory detentions. Looking first to the non-investigatory detention the court must determine if there are articulable facts to justify the contact and brief detention. Ranger Bueter had received a report of a man sitting in a vehicle with his head lying on top of the steering wheel with the engine running.

In addition the individual was reported to be "groggy." Ranger Bueter arrived approximately twenty minutes later finding the individual still in the same position sitting in the vehicle with the engine running. Ranger Bueter testified that he considered diabetic shock or carbon monoxide poisoning as possible explanations for the defendant's behavior. The individual did not react when the Ranger shined his flashlight into the vehicle and was slow to respond to verbal stimulus. The Ranger clearly had articulable reasons to contact the Defendant based upon a concern for the Defendant's welfare. Sitting in a running automobile with your head on top of the steering wheel is sufficiently unusual and concerning behavior. Any law enforcement officer would be remiss in not conducting further inquiry to ascertain the health of the individual, especially if the individual appeared groggy. The statements, made by the Defendant to the Deputy and later to the Ranger that he was okay, on their own are not sufficient to allay the officers concerns and terminate the investigation. A reasonable officer, especially with medical training, would be expected to conduct further inquiry. In this matter, Mr. Zimmerman volunteered that he had been drinking within 10 seconds of being asked if he was okay by Ranger Bueter.

 The Officers contact with Mr. Zimmerman also qualified as an investigatory detention. The Officers had reason to suspect that Mr. Zimmerman was staying in his vehicle at a location which was not approved for camping. Locations within Yellowstone National Park where people may camp are restricted and camping in non-designated areas is prohibited. Title 36 Code of Federal Regulations § 2.10(b) reads in relevant part:

§ 2.10 Camping and food storage.

(b)The following are prohibited:

. . .

(10) Camping outside of designated sites or areas.

The regulations further define "camping" as "the erecting of a tent or shelter of natural or synthetic materials, preparing a sleeping bag or other bedding material for use, parking of a motor vehicle, motor home or trailer, or mooring of a vessel for the apparent purpose of overnight occupancy." 36 C.F.R. § 1.4(a).

 An evaluation of an investigatory detention, which is often referred to as a *Terry* detention, is a seizure pursuant to the Fourth Amendment and must satisfy a two prong analysis. The Fourth Amendment is not a guarantee against all seizures, just unreasonable ones. *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985). The first inquiry is if the officer's actions were justified at the inception of the detention. The officer must have an articulable and reasonable suspicion that the person detained is engaged in criminal activity. The second inquiry is if the officer's detention is reasonably related in scope to the circumstances which justified the interference in the first place. *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879.

 Only reasonable suspicion is required to justify an investigatory detention, meaning the officer had a particularized and objective basis for suspecting legal wrongdoing. *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 751, 66 L.Ed.2d 621 (1981).

When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. This process allows officers to draw on their own experience and specialized training to

make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person." See also *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (reviewing court must give "due weight" to factual inferences drawn by resident judges and local law enforcement officers). Although an officer's reliance on a mere 'hunch' is insufficient to justify a stop the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard. (Citations omitted)

*United States v. Arvizu*, 534 U.S. 266, 273–74, 122 S.Ct. 744, 750–51, 151 L.Ed.2d 740 (2002)

Reasonable suspicion is not a high level of proof and was described as follows in *United States v. Madrid*, 713 F.3d 1251, 1256 (10th Cir.2013):

Police officers must have more than a "hunch" to justify stopping an individual, but "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274, 122 S.Ct. 744. We have held that "as long as [the detaining officer] has a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention even if it is more likely than not that the individual is not involved in any illegality." *United States v. Johnson*, 364 F.3d 1185, 1194 (10th Cir.2004) We apply an objective standard to determine whether the "facts available to the officer at the moment of the seizure or the search [would] warrant a man of reasonable caution in the belief that the action taken was appropriate." *Terry*, 392 U.S. at 22, 88 S.Ct. 1868 (internal quotation marks omitted). Due to their "experience and specialized training," we "accord deference to an officer's ability to distinguish between innocent and suspicious actions." [*United States v.*] *Gandara–Salinas*, 327 F.3d [1127] at 1130 [ (10th Cir.2003) ].

The first prong addresses the officer's initial contact and detention. In addition to the Ranger's concern for the well-being of Mr. Zimmerman and assuming that Mr. Zimmerman was not in distress, it would appear for reasons unknown to the Ranger Mr. Zimmerman was sleeping in his vehicle during the night and had been at that location for a period of at least 20 minutes. Therefore, the Ranger had a reasonable suspicion that Mr. Zimmerman was using the vehicle for nighttime occupancy and sleep. In that such camping is a violation of National Park Service regulations, the Ranger had a reasonable suspicion of criminal activity.

The second prong concerns the length and nature of the detention. The stop "must last no longer than is necessary to effectuate the purpose of the stop." *United States v. Pena–Montes*, 589 F.3d 1048, 1052 (10th Cir.2009). In this matter Mr. Zimmerman volunteered that he had been drinking within 30 seconds of the Ranger's first communication with Mr. Zimmerman. At that point the Ranger also smelled the odor of an alcoholic beverage on Mr. Zimmerman and clearly had a reasonable suspicion that Mr. Zimmerman may be in violation of laws related to the consumption of alcohol while being in physical control of a motor vehicle. The defense does not contest the actions of the officers in detaining the Defendant following the detection of alcohol upon the Defendant's breath. The detention of the Defendant to ascertain if he was engaged in illegal camping was reasonable both in manner and duration. The Ranger had only re-

quested the Defendant speak with them and asked him to exit the vehicle prior to the detection of alcohol. Both requests were appropriate to the Ranger's investigation.

**Montana Implied Consent Advisement**

■ The Defendant first asserts that state substantive law applies and cites *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.* 559 U.S. 393, 130 S.Ct. 1431, 176 L.Ed.2d 311 (2010). This case is not relevant to the issue at hand. *Shady Grove* concerns a conflict between state law and the federal rules regarding class action pending in federal court pursuant to diversity jurisdiction. While the Defendant's statement is correct regarding federal courts hearing civil matters sitting in diversity, it has no application to federal courts considering criminal charges alleging a violation of federal law. State law does not control the admissibility of evidence in federal criminal cases. *U.S. v. Turner*, 209 F.3d 1198, 1199 (10th Cir. 2000); *U.S. v. Dickerson*, 195 F.3d 1183 (10th Cir.1999); and *U.S. v. Le*, 173 F.3d 1258 (10th Cir.1999). "[N]either the statutes nor decisional law of the forum state control the admissibility of evidence in any phase of a federal criminal action." *United States v. Turner*, 497 F.2d 406, 407 (10th Cir.1974). In *U.S. v. Hooks*, 780 F.2d 1526 (10th Cir.1986) the defendant sought to exclude evidence of his refusal to submit to a blood test by asserting the application of the Oklahoma implied consent law. In rejecting this argument the court said:

> Appellant relies on *McCullick v. State*, 682 P.2d 235 (Okl.Crim.App.1984), a case in which the Oklahoma Court of Criminal Appeals held that evidence of refusal to submit to a blood test is inadmissible in a trial for driving under the influence of alcohol (DUI). A close reading of that case, and the cases cited therein, makes clear that the Oklahoma court's

holding was not based on constitutional principles, but rather on the court's interpretation of an Oklahoma statute granting persons arrested for DUI an absolute right to refuse to submit to a blood-alcohol test. "[N]either the statutes nor decisional law of the forum state control the admissibility of evidence in any phase of a federal criminal action." *United States v. Turner*, 497 F.2d 406, 407 (10th Cir.1974). Thus, appellant's reliance on *McMullick* [*McCullick*] is misplaced.

*United States v. Hooks*, 780 F.2d at 1535.

The government cited a recent rejection of the Defendant's argument in *United States. v. Henderson*, 2015 WL 3477005 (M.D.Ga.) in which the Magistrate Judge rejected the assertion that Georgia's implied consent law was applicable to a federal driving under the influence arrest arising under federal regulation applicable to the Army's Fort Benning. "Defendant's arguments concerning O.C.G.A. §§ 40–6–392 and 40–5–67.1 and the implied consent waiver are likewise unavailing. '[F]ederal law, not state law, governs the admissibility of the evidence in federal court, and complaints that the evidence was obtained in violation of state law are of no effect.' *United States v. Noriega*, 676 F.3d 1252, 1263 n. 4 (11th Cir.2012)."

This same argument was previously rejected by this Court in regards to the Wyoming implied consent law. In *United States v. Parrent*, 2012 WL 113569 Judge Stephen Cole stated "[b]ecause Defendant's arrest occurred within the external boundaries of Yellowstone National Park, on federal property, the federal implied consent law controls. *See e.g., U.S. v. Farmer*, 820 F.Supp. 259, 262–63 (W.D.Va. 1993) and *United States v. Love*, 141 F.R.D. 315 (D.Colo.1992). The Wyoming implied consent warning and its attendant procedural requirements are not applicable

here." The same is equally true for the Montana implied consent law.

### Federal Implied Consent Advisement

■ The Defendant next challenges the sufficiency and content of the federal implied consent law. This offense occurred within the boundaries of Yellowstone National Park, a special maritime and territorial jurisdiction of the United States, and is subject to 18 U.S.C. § 3118 which reads in relevant part:

(a) Consent.—Whoever operates a motor vehicle in this special maritime and territorial jurisdiction of the United States consents thereby to a chemical test or tests of such person's blood, breath, or urine, if arrested for any offense arising from such persons driving while under the influence of a drug or alcohol in such jurisdiction. The test or tests shall be administered upon the request of a police officer having reasonable grounds to believe the person arrested to have been driving a motor vehicle upon the special maritime and territorial jurisdiction of the United States while under the influence of drugs or alcohol in violation of the laws of a State, territory, possession, or district.

(b) Whoever, having consented to a test or tests by reason of subsection (a), refuses to submit to such a test or tests, after having first been advised of the consequences of such a refusal, shall be denied the privilege of operating a motor vehicle upon the special maritime and territorial jurisdiction of the United States during the period of a year commencing on the date of arrest upon which such test or test was refused, ...

While being booked into the Yellowstone detention facility Mr. Zimmerman was verbally advised of his chemical testing rights as noted above. Mr. Zimmerman was not provided an opportunity to obtain an independent chemical test.

■ Many, if not all states, have enacted laws which created an implied consent to a chemical test for any person operating or in physical control of a motor vehicle. Those laws generally allow a person suspected of driving under the influence to refuse a chemical test, but allow evidence of that refusal to be admitted at trial and some loss of driving privileges. The United States Supreme Court has ruled that a state may force a person suspected driving under the influence to submit to a blood alcohol test: *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) and *South Dakota v. Neville*, 459 U.S. 553, 559, 103 S.Ct. 916, 920, 74 L.Ed.2d 748 (1983)[3]. Nevertheless, states and the federal government have legislatively limited governments' right to obtain testing. The advisement which was read to Mr. Zimmerman is a correct and proper statement of the federal law. Mr. Zimmerman complains that he was not advised of his right to challenge administratively any action against his driving privileges. Defendant does not provide any legal authority for this position and that United States Supreme Court found that the failure to warn a suspect that his refusal could be admitted into evidence at his trial did not render the implied consent advisement faulty. *South Dakota v. Neville*, 459 U.S. at 566, 103 S.Ct. 916. Implied consent advisements are not of a constitutional origin but rather a statutory grace bestowed by legislative bodies. *United*

---

3. Obtaining a test does implicate the Fourth Amendment and may require a search warrant under appropriate circumstances. *Mis-souri v. McNeely*, —— U.S. ——, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013).

*States v. Harrington,* 749 F.3d 825, 830 (9th Cir.2014).

The defense asserts that the Defendant was somehow coerced by the statements of Ranger Bueter in regards to potential impact upon Defendant's employment. The booking video establishes that the Defendant readily agreed to a chemical test upon the completion of the advisement and never expressed any reservations or second thoughts in regard to taking the test. The conversations with Defendant were carried out in a friendly and helpful nature unrelated to any issues regarding chemical testing. The defense also commented on a right to obtain exculpatory evidence but provided no relevant authorities to support that argument. Defendant does cite Montana cases regarding the right to exculpatory evidence, but such law is not applicable in this federal prosecution, as noted above.

THEREFORE THE COURT HEREBY FINDS AND ORDERS that the Defendant's *Motion to Suppress and Dismiss* is hereby DENIED.